STATE OF CONNECTICUT *v.* DANTE DELORETO
(SC 16908)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

---

146

Argued April 15—officially released August 5, 2003

*William B. Westcott*, with whom was *Jon L. Schoen-horn*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *A. Ryan McGuigan*, former deputy assistant state's attorney, for the appellee (state).

*Martin B. Margulies* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Opinion*

SULLIVAN, C. J. The defendant, Dante DeLoreto, appeals from the judgment of conviction, rendered after a trial to the court, on charges of two counts of breach of the peace in the second degree in violation of General Statutes § 53a-181.[1] The defendant claims that: (1) his

---

[1] General Statutes § 53a-181 provides: "(a) A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests.

"(b) Breach of the peace in the second degree is a class B misdemeanor."

conviction violates the free speech provisions of the federal and state constitutions; and (2) § 53a-181 (a) is unconstitutionally vague as applied to the defendant and unconstitutionally overbroad. We affirm the judgment of the trial court.

The record reveals the following relevant facts. The defendant was involved in two separate incidents involving Wethersfield police officers. The first incident occurred on June 9, 2000. Robert Labonte, a Wethersfield police sergeant who was off duty, was jogging on Fairmount Street in Wethersfield, near the defendant's residence. Labonte had been jogging this route for the previous nineteen years. At approximately 7:10 a.m., Labonte noticed a car driving slowly beside him. He looked over at the driver of the car and recognized the defendant, who had brought an action against Labonte in federal court.[2] The defendant was hanging out of the driver's side window, holding up his middle finger and yelling at Labonte. Labonte lowered the volume on the radio headphones that he was wearing and heard the defendant state, "Faggot, pig, I'll kick your ass." Labonte replied: "Dante . . . what's your problem with me?" The defendant stated that he had "a problem with fags," referring to Labonte and several other officers who were named in the defendant's federal lawsuit. The defendant further stated: "I'm going to own your house. I got a federal lawsuit against you for breaking into my house." Labonte told the defendant to "let it go . . . ."

Labonte continued to jog along Fairmount Street to the intersection of Darwell Drive. At this point, the defendant sped past Labonte and made a left turn onto Darwell Drive in front of Labonte. The defendant stopped his car in the middle of the road and, as Labonte

---

[2] The defendant had brought an action against Labonte and four other officers in federal court in connection with an incident that occurred at the defendant's house in 1997. That action is still pending. *DeLoreto* v. *Erdman*, United States District Court, Docket No. 3:00CV210 (JCH) (D. Conn.).

jogged by, started to get out of the car. As the defendant opened the car door, he stated: "I'm going to kick your ass, punk . . . ." Labonte, who thought that the defendant was going to exit his car, stated: "Don't start it," or "Don't do it . . . ." Labonte continued jogging and the defendant closed his car door and continued driving. Labonte thought that the incident was over until the defendant again sped past him. The defendant then stopped his car in the middle of the road, turning the vehicle clockwise in the road between Maxwell Drive and Fairmount Street on Darwell Drive. The defendant suddenly swung open the car door, jumped out of the car and ran toward Labonte. He pumped his fists and stated: "I'm going to kick your ass." Labonte stopped jogging and prepared to defend himself. The defendant stopped about ten to twelve feet away from Labonte. A witness to the incident, Norman Davidson, felt that "there was going to be a fight."[3]

The second incident occurred on June 15, 2000. At approximately 6:15 a.m., Andrew Power, a Wethersfield police sergeant, entered the Food Bag, a convenience store located on the Silas Deane Highway in Wethersfield, where he intended to purchase a gallon of milk and a newspaper. Approximately five to ten minutes later, the defendant entered the store. He walked behind Power, who was standing at the counter talking with one of the store's employees. The defendant stepped to Power's right, and Power paid for his purchases and stepped to the left. It appeared that the defendant was trying to read Power's name tag, at which point Power stated: "If you're trying to read my name, I'll tell you my name." In response, the defendant stepped back, raised his fist and stated: "You have a problem with me?" Power responded: "You give me the finger every

---

[3] The record before this court does not indicate how this incident ultimately ended. It is clear, however, that the defendant did not physically assault Labonte.

time you see me. Please stop giving me the finger." The defendant had gestured obscenely to Power with his finger five to ten times during the previous weeks before this incident. The defendant was acting aggressively and Power assumed a defensive position. Power walked out of the store to his cruiser. The defendant followed Power and, as he left the store, stated: "I'm going to kick your punk ass." Once outside the store, he repeated the statement several more times. Power got into his cruiser and then realized that he had not picked up the newspaper that he had purchased. Power got out of his cruiser, took a newspaper off the stand outside of the store, and got back into his cruiser. The defendant continued to yell at Power.

There were two witnesses to this incident. One witness, Joann Mirles, at first believed that Power and the defendant were just "goofing around," but when the defendant "started getting very loud . . . [she] realized they were not just . . . having words or goofing around. It was serious." The second witness to this incident, Linda Syphers, believed that an altercation might occur.

The defendant was charged with a single count of breach of the peace in violation of § 53a-181 (a) (1), (3) and (5), for each incident. On August 31, 2000, the defendant filed a motion to dismiss the case on the grounds that: (1) § 53a-181 is unconstitutionally vague;[4] (2) § 53a-181 is unconstitutionally overbroad; and (3) when directed at police officers, the defendant's statements were constitutionally protected speech. The defendant was tried to the court for both incidents and, at the close of the state's case, made an oral motion for judgment of acquittal on the same grounds as his

---

[4] The defendant did not limit his claim to any specific subsection of the statute.

motion to dismiss.[5] The trial court denied both motions on the grounds that: (1) the defendant's statements constituted fighting words and, therefore, were not protected speech; and (2) § 53a-181 is neither unconstitutionally vague nor overbroad. The defendant was convicted of two counts of breach of the peace in the second degree in violation of § 53a-181 (a) (1), (3) and (5). The defendant appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant claims that the trial court improperly concluded that: (1) his statements constituted fighting words as applied to police officers; and (2) § 53a-181 (a) was neither unconstitutionally vague as applied to the defendant nor unconstitutionally overbroad. We conclude that the statements made by the defendant constituted true threats and, as such, were not protected by the federal and state constitutions. We therefore further conclude that the defendant properly was convicted under § 53a-181 (a) (3), which provides in relevant part that a person is guilty of breach of the peace when that person, "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . threatens to commit any crime against another person or such other person's property . . . ."[6] Finally, we conclude that the trial court properly determined that § 53a-181 (a) (3) is neither unconstitutionally vague as applied to the defendant nor overbroad. Accordingly, we affirm the judgment of the trial court.

## I

The defendant first claims that because his convictions for breach of the peace were based on protected speech

---

[5] The trial court agreed to hear and decide both the motion to dismiss and the motion for judgment of acquittal at the same time.

[6] Because we conclude that the defendant properly was convicted for both counts of breach of the peace in violation of § 53a-181 (a) (3), we need not reach the issue of whether the defendant violated § 53a-181 (a) (1) and (5).

under the first and fourteenth amendments to the federal constitution and article first, §§ 4,[7] 5[8] and 14,[9] of the Connecticut constitution,[10] the trial court improperly concluded that his statements to Labonte and Power constituted fighting words as applied to police officers. The state offers, as an alternate ground for affirmance, the claim that the defendant's statements constituted "true threats," which fall outside the ambit of constitutionally protected speech.[11] We agree with the state.

We begin by setting forth the relevant standard of review. "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of

---

[7] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[8] Article first, § 5, of the constitution of Connecticut provides in relevant part: "No law shall ever be passed to curtail or restrain the liberty of speech . . . ."

[9] Article first, § 14, of the constitution of Connecticut provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

[10] The defendant's state constitutional claim amounts to an assertion that the free speech protection provided by the constitution of Connecticut, which bestows greater expressive rights on the public than does the federal constitution, is expansive enough to encompass "fighting words." Because we conclude that the defendant's statements were true threats, we need not address this claim.

[11] Pursuant to Practice Book § 63-4 (a) (1), the state filed a preliminary statement of the issues setting forth alternate grounds for affirmance. The state did not, however, include its claim that the defendant's statements constituted true threats in its preliminary statement of the issues. Nevertheless, we will address the issue because the defendant had adequate opportunity to respond to the state's claim in a reply brief, which the defendant waived filing. Moreover, the defendant addressed this claim on its merits at oral argument before this court and did not present us with any evidence that he was prejudiced. See *Russell* v. *Mystic Seaport Museum, Inc.*, 252 Conn. 596, 599–600 n.3, 748 A.2d 278 (2000).

alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases where that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. . . . We must make an independent examination of the whole record . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." (Citations omitted; internal quotation marks omitted.) *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We recently have reiterated this de novo scope of review in free speech claims in *DiMartino* v. *Richens,* 263 Conn. 639, 661–62, 822 A.2d 205 (2003) (applying de novo standard of review in determining protected status of government employee speech).

Moreover, we note that "[w]here the trial court reaches a correct decision but on [mistaken] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it. . . . [W]e . . . may affirm the court's judgment on a dispositive alternate ground for which there is support in the trial court record." (Citation omitted; internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* 259 Conn. 592, 599, 790 A.2d 1178 (2002).

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.' The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the First Amendment 'ordinarily' denies a State 'the power to prohibit

dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.' . . . The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

"The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. . . . The First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' . . .

"Thus, for example, a State may punish those words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' . . . Furthermore, 'the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.' . . . And the First Amendment also permits a State to ban a 'true threat.' . . .

" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " (Citations omitted.) *Virginia* v. *Black*, 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

The United States Court of Appeals for the Fifth Circuit has articulated the rationale underlying the removal of true threats from first amendment protection. "The notion that some expression may be regulated consistent with the first amendment . . . starts with the already familiar proposition that expression has special value only in the context of dialogue: communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . . It is not plausible to uphold the right to use words as projectiles where no exchange of views is involved." (Internal quotation marks omitted.) *Schackelford* v. *Shirley*, 948 F.2d 935, 938 (5th Cir. 1991), quoting L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-8, pp. 836–37.

That court further stated that, "[a]s speech strays further from the values of persuasion, dialogue and free exchange of ideas the first amendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts, the state has greater latitude to enact statutes that effectively neutralize verbal expression." *Schackelford* v. *Shirley*, supra, 948 F.2d 938. Finally, that court concluded that, "as expansive as the first amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection." Id. Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. See *Watts* v. *United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (statement that speaker would shoot president of

United States made at political rally constituted protected political hyperbole).

In the context of a threat of physical violence, "[w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . Although a threat must be distinguished from what is constitutionally protected speech . . . this is not a case involving statements with a political message. A true threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment." (Citations omitted; internal quotation marks omitted.) *United States* v. *Orozco-Santillan*, 903 F.2d 1262, 1265–66 (9th Cir. 1990) (applying 18 U.S.C. § 115, which prohibits threatening to assault federal law enforcement officer). Moreover, "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." Id., 1265.

We now turn, therefore, to an examination of the incidents involving Labonte and Power to determine "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." Id. The state claims that the statements made by the defendant to Labonte— namely, "I'll kick your ass"; "I'm going to kick your ass, punk"; "Come on, right now"; and "I'm going to kick your ass"—constituted true threats. There is no question that the statements themselves constitute, unequivocally, threats to commit an assault. The question then becomes whether a reasonable person would have believed that the threats, taken in context, were mere

hyperbole or jokes and, thus, protected by the first amendment.

Considering these statements "in light of their entire factual context, including the surrounding events and reaction of the listeners"; id., 1266; we conclude that the defendant's statements constituted a true threat. The defendant had a history of confrontational behavior with Labonte, having "given him the finger" on several occasions in the past. Moreover, Labonte was off duty, unarmed, and on foot, while the defendant was in his car when he made the first two statements. The defendant was driving erratically, speeding up, slowing down and cutting in front of Labonte. Additionally, the defendant, in connection with one of the statements, suddenly swung open his car door, jumped out of the car, and ran toward Labonte while pumping his fists, at which point Labonte prepared to defend himself. Finally, the witness to this incident testified that he believed a fight was going to take place. Under these circumstances, a reasonable person would foresee that the statements would be interpreted by Labonte as a serious expression of the defendant's intent to harm or assault Labonte.

The defendant urges us to conclude, however, that, in light of the fact that the defendant had brought an action against Labonte, the statements evidenced his belief that he would prevail in court. We are not persuaded. The unequivocally threatening nature of the statements, within the context in which they were spoken, leads us to conclude that the statements were not mere hyperbole or jokes; rather, the statements were "a serious expression of intent to harm"; id., 1265; and, thus, unprotected speech.

We now turn to an examination of the incident involving Power. The state claims that the defendant's statements to Power—namely, "You got a problem with

me?"; "I'm going to kick your punk ass"; and "I'll kick your ass"—constituted true threats. Considering these statements in light of their entire factual context, including the surrounding events and reaction of the listeners, we conclude that the defendant's statements constituted a true threat. As with the first incident, the statements "I'm going to kick your punk ass" and "I'll kick your ass" are unequivocally threats. The statement "You got a problem with me" will bear other interpretations, and the defendant urges us to conclude that, rather than threatening Power, the defendant merely was asking a question. This interpretation is unreasonable, however, in light of the fact that the defendant raised his fist while making the statement. Indeed, Power responded to this statement and the defendant's accompanying conduct by assuming a defensive stance and then leaving the store in an attempt to deescalate the situation. Moreover, the defendant stated that he would "kick [Power's] punk ass" while he was pursuing Power out of the store and into the parking lot, causing Power to become fearful. As he had with Labonte, the defendant had a history of confrontational behavior with Power, having "given [Power] the finger" five to ten times during the weeks leading up to the incident.

We note that Power, unlike Labonte, was on duty and armed. These facts, however, do not require a different conclusion. The fact that Power was better able to defend himself than Labonte does not lessen the impact of the threat; it just made it more difficult for the defendant to carry out his threat immediately. Imminence, however, is not a requirement under the true threats doctrine. *Virginia* v. *Black,* supra, 538 U.S. 359–60 (" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat.

Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " [Citations omitted.]); *In re M.S.*, 10 Cal. 4th 698, 711, 896 P.2d 1365, 42 Cal. Rptr. 2d 355 (1995) ("The [defendants] err, however, in assuming the First Amendment always requires the threatened harm be imminent for the threat to be constitutionally punishable. It does not."). Nor does our breach of the peace statute require that the threat be imminent. Section 53a-181 (a) (3) requires that the state prove, beyond a reasonable doubt, that the defendant: (1) threatened to commit a crime against another person or that person's property; (2) with the intent to cause "a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm." *State* v. *Wolff*, 237 Conn. 633, 670, 678 A.2d 1369 (1996). Accordingly, we conclude that the threat need not be imminent to constitute a constitutionally punishable true threat.

The defendant also claims that the fact that Power got out of his cruiser to retrieve his newspaper indicates that the statements made by the defendant could not reasonably be perceived as a true threat. We disagree. This assumes an imminence requirement that, as we have stated, does not exist under the true threats doctrine. The fact that Power perhaps believed that the defendant would not act if he stepped out of his cruiser to retrieve his paper is not relevant. The standard is whether a reasonable person would foresee that Power would interpret the statements as a serious expression of the defendant's intent to harm or assault Power. The fact that Power retrieved his newspaper does not lessen the impact of the statements made as the defendant raised his fist and then pursued Power into the parking lot.

The defendant further claims that the fact that Power left the two store employees alone with the defendant undermines the conclusion that the defendant's statements constituted a true threat. We again disagree. The statements were directed at Power, not at the store clerks. Moreover, the defendant had a history of confrontational behavior with Wethersfield police officers, while there is nothing in the record before this court to indicate that the defendant had engaged in such behavior with persons not connected with law enforcement. The fact that Power left the store while the defendant was still there, thus, has no bearing on whether Power reasonably could have felt personally threatened by the defendant. The threatening nature of the statements made by the defendant to Power, together with the context in which they were spoken, lead us to conclude that the statements were not mere hyperbole or jokes; rather, the statements were true threats and thus unprotected speech.

Finally, the defendant claims that when an alleged threat is made to a police officer, a narrower class of statements should qualify as true threats than would qualify when spoken to an ordinary citizen. The defendant analogizes the true threats doctrine to the fighting words doctrine, under which some courts have concluded that, where a police officer is the only person "upon whose sensibilities the inflammatory language could have played, a conviction can be supported only for '[e]xtremely offensive behavior supporting an inference that the actor wished to provoke the policeman to violence.' " *State* v. *Nelson,* 38 Conn. Sup. 349, 354, 448 A.2d 214 (1982); see also *Lewis* v. *New Orleans,* 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring). We are not persuaded.

First, the defendant provides no authority for his assertion that a narrower class of statements will qualify as true threats when spoken to a police officer. Our research indicates that, to the contrary, in those federal cases that have applied the true threats doctrine to

statements made to federal law enforcement officials, federal courts have applied the same reasonable person standard that is applied to civilians. See, e.g., *United States* v. *Orozco-Santillan,* supra, 903 F.2d 1265–66 (Immigration Naturalization Service agent); see also *United States* v. *Fulmer,* 108 F.3d 1486, 1491–93 (1st Cir. 1997) (Federal Bureau of Investigations special agent); *United States* v. *Hoff,* 22 F.3d 222, 224 (9th Cir. 1994) (United States forest service officer); *United States* v. *Pacione,* 950 F.2d 1348, 1355 (7th Cir.), cert. denied, 505 U.S. 1229, 112 S. Ct. 3054, 120 L. Ed. 2d 920 (1992) (federal revenue officer).[12]

The rationale that underlies the rule that a narrower class of speech qualifies as fighting words when spoken

[12] Our research also reveals, however, that at least one state appears to confine the true threats doctrine to a narrower class of statements when the alleged threat is directed at a police officer. In *State* v. *Valdivia,* 95 Haw. 465, 474, 24 P.3d 661 (2001), the defendant stated to a police officer: "I'm gonna kill you and your police uniform . . . ." (Internal quotation marks omitted.) The defendant was convicted under the state's terroristic threats statute, which required the prosecution to prove beyond a reasonable doubt that the defendant threatened, by words, to cause bodily injury to another in reckless disregard of the risk of terrorizing that person. Id. The defendant appealed claiming that the trial court improperly had refused to instruct the jury that "[w]here a threat is directed at a police officer, [the jury] may consider that police officers are trained to a professional standard of behavior that ordinary citizens might not be expected to equal." (Internal quotation marks omitted.) Id., 479. In making his claim, the defendant relied on *In the Interest of Doe,* 76 Haw. 85, 869 P.2d 1304 (1994), in which the Supreme Court of Hawaii applied the fighting words doctrine to a police officer. *State* v. *Valdivia,* supra, 479.

The Supreme Court of Hawaii acknowledged that the fighting words doctrine was not directly on point. That court concluded, however, that "the gist of *Doe* nevertheless applies in the context of a prosecution for terroristic threatening. As such, the jury in the present matter should have been instructed that it could consider relevant attributes of both the defendant and the subject of the allegedly threatening utterance in determining whether the subject's fear of bodily injury, as allegedly induced by the defendant's threatening utterance, was objectively reasonable under the circumstances in which the threat was uttered." Id. That court, thus, appears to have narrowed the class of statements considered true threats when the listener is a police officer, apparently relying on the rationale underlying

to a police officer, namely that "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words"; (internal quotation marks omitted) *Lewis* v. *New Orleans*, supra, 415 U.S. 135 (Powell, J., concurring); does not apply in the context of a true threat. Police officers are trained to be more "thick-skinned" than an ordinary citizen because "outrage is a normal reaction of an innocent person who is accosted as a potential suspect in a police investigation and . . . resort to vilification in such a situation is typical of contemporary manners." *State* v. *Nelson*, supra, 38 Conn. Sup. 354. The essence of a true threat, however, is that, upon hearing it, a reasonable person believes that the listener perceives that he will be subjected to physical violence. A police officer has no greater duty than a civilian has to submit to the threat of a criminal assault. In other words, fighting words are intended as provocation, which a police officer should be expected to resist, while a true threat is "a serious expression of intent to harm"; *United States* v. *Orozco-Santillan*, supra, 903 F.2d 1265; the nature of which does not depend on the particular sensitivities of the listener.

Moreover, "a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders . . . ." (Internal quotation marks omitted.) *Virginia* v. *Black*, supra, 538 U.S. 360. Fear, in this context, includes not only fear of physical harm, but also fear that the threat will be carried out. The defendant provides us with no reason, other than an officer's training, for distinguishing between police officers and regular citizens in determining whether a statement constitutes a true threat. A police officer is not trained to be fearless in the face

the fighting words doctrine. For the reasons discussed in this opinion, however, we are not persuaded by this reasoning.

of a credible threat that he will be the victim of a crime, and we can perceive of no reason that he should be; nor are true threats typical of contemporary manners such that we should expect police officers to have a "thick skin." The defendant maintains, however, that because police officers are trained to differentiate between situations that present a threat and those that do not, a reasonable person should expect that they somehow will remain indifferent when faced with the threat of crime. We are not persuaded. It does not logically follow that a police officer, because of his unique ability to appraise the level of danger in a given situation, will be less likely than the average citizen to believe that an otherwise credible threat will be carried out when that threat is directed specifically at him.

Finally, a narrower class of statements constitutes fighting words when spoken to police officers, rather than to ordinary citizens, because of the communicative value of such statements. "The [c]onstitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston* v. *Hill*, 482 U.S. 451, 462–63, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) (striking down statute that prohibited speech that " 'in any manner' " interrupts police officer as overbroad). True threats, however, do not serve the same purpose as fighting words. By their very nature, true threats have no communicative value but, rather, are "words [used] as projectiles where no exchange of views is involved." (Internal quotation marks omitted.) *Schackelford* v. *Shirley* supra, 948 F.2d 938, quoting L. Tribe, supra, § 12-8, p. 837. Accordingly, we conclude that the first amendment does not demand that we narrow the class of statements that constitute true threats when spoken to a police officer.

## II

The defendant next claims that the breach of the peace statute, § 53a-181 (a) (3),[13] is both unconstitutionally vague as applied to him and unconstitutionally overbroad. We disagree.

### A

We begin with the defendant's claim that § 53a-181 (a) (3) is vague as applied to him in violation of the first and fourteenth amendments to the Unites States constitution.[14] "The purpose of the vagueness doctrine is twofold. The doctrine requires statutes to provide fair notice of the conduct to which they pertain and to establish minimum guidelines to govern law enforcement. The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and dis-

---

[13] The defendant's claim encompasses § 53a-181 (a) (1), (3) and (5). Because we have concluded that the defendant properly was convicted under § 53a-181 (a) (3), we limit our constitutional inquiry to that subsection of the statute.

[14] We note that the defendant has limited his claim to an "as applied" challenge and does not raise a claim of facial vagueness.

criminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement. . . .

"Third, but related, where a vague statute abut[s] upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked. . . .

"These standards should not . . . be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. . . . The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the [defendant] that his conduct is proscribed. . . . [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." (Citations omitted; internal quotation marks omitted.) *State* v. *Indrisano*, 228 Conn. 795, 802–804, 640 A.2d 986 (1994).

"Our vagueness inquiry . . . extends only to those portions of the statute that were applied to the defendant in this case." Id., 804. Thus, we confine our vagueness analysis to the conduct specified in § 53a-181 (a) (3). See id., 804–805.

The defendant does not point to any language in the statute that he claims renders it unconstitutionally vague. Rather, he merely states that the statute is uncon-

stitutional because "[t]he judicial gloss which confines the expansive provisions of our breach of the peace statute within constitutionally acceptable parameters does not address the circumstance where police officers are the purported victims of the breach of the peace." The defendant further claims that prior "caselaw on the subject of speech directed towards law enforcement shed[s] little light on this subject. Certainly more vile and offensive terms directed towards police have been found to be protected from criminal sanction." The defendant is, in essence, asserting an overbreadth claim—a claim that the statute will reach protected conduct—under the guise of a vagueness challenge.

"[A]lthough the doctrines of overbreadth and vagueness are closely related . . . they are distinct. . . . A statute may be overbroad without being vague. For example, a statute making it a crime to use the words kill and President in the same sentence is not vague, but is clearly overbroad. By contrast, a vague statute may or may not be overbroad; the vice of vagueness is that someone contemplating a course of conduct, expressive or otherwise, may be unable to tell what is forbidden." (Citations omitted; internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 813 n.20, 761 A.2d 705 (2000). The terms of § 53a-181 (a) prohibit a speaker, "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof," from "(3) threaten[ing] to commit any crime against another person or such other person's property . . . ." The essence of the defendant's vagueness claim is that he cannot know how the statute applies to speech directed at a police officer. On its face, however, the statute applies to any speech that meets the requirements of the statute. Although we recognize that, in the absence of a judicial gloss, § 53a-181 (a) (3) could be construed as overbroad; see part II B of this opinion; the terms of the statute are not so vague that the statute does not "give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited, so that he may act accordingly." (Internal quotation marks omitted.) *State* v. *Indrisano*, supra, 228 Conn. 802. Accordingly, we conclude that the trial court properly rejected the defendant's claim that § 53a-181 (a) is unconstitutionally vague.

## B

We next consider the defendant's claim that the trial court improperly concluded that § 53a-181 (a) (3) is not unconstitutionally overbroad. "A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. . . . A [defendant] may challenge a statute as facially overbroad under the first amendment, even if the [defendant's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute. . . . Thus, the [defendant] has standing to raise a facial overbreadth challenge to the [statute] and may prevail on that claim if he can establish that the [statute] reaches a substantial amount of constitutionally protected conduct even though he personally did not engage in such conduct." (Citations omitted; internal quotation marks omitted.) *Leydon* v. *Greenwich*, 257 Conn. 318, 335, 777 A.2d 552 (2001).

The defendant's claim that § 53a-181 (a) is unconstitutionally overbroad is based on the same ground as his vagueness challenge, namely, that "[t]he judicial gloss which confines the expansive provisions of our breach

of the peace statute within constitutionally acceptable parameters does not address the circumstances where police officers are the purported victims of the breach of the peace." The defendant maintains that a substantial amount of protected speech will be criminalized under the breach of the peace statute because this court has not passed on the question of whether, "where a police officer is the only person upon whose sensibilities the inflammatory language could have played, a conviction can be supported for only '[e]xtremely offensive behavior supporting an inference that the actor wished to provoke the policeman to violence.' " *State* v. *Nelson*, supra, 38 Conn. Sup. 354; see also *Lewis* v. *New Orleans*, supra, 415 U.S. 135 (Powell, J., concurring). The protected speech that the defendant claims will be criminalized, therefore, is that category of statements that, while it would constitute fighting words for an ordinary citizen, is not offensive enough to provoke a police officer to violence.

Thus far, in construing § 53a-181 (a) (3), we have confined our discussion to the true threats doctrine. We do not believe, however, that this subsection criminalizes only true threats. Threatening statements that do not rise to the level of a true threat may nonetheless constitute fighting words that could be criminalized under this subsection consistent with the first amendment. Accordingly, this subsection potentially could encompass that class of statements that, while they would qualify as fighting words for the ordinary citizen, are not offensive enough to provoke a police officer to violence and are, thus, protected speech. We have concluded that the defendant's speech did not fall within this category of speech but was, rather, a true threat. We have noted, however, that, "in a first amendment context, a defendant may challenge the validity of a statute's application to marginal situations even though his own conduct may clearly fall within the

statute's proscriptions." *State* v. *Pickering,* 180 Conn. 54, 57–58 n.3, 428 A.2d 322 (1980). Therefore, to avoid invalidation of § 53a-181 (a) (3) on grounds of overbreadth, we adopt, by way of judicial gloss, the conclusion that, when a police officer is the only person "upon whose sensibilities the inflammatory language could have played, a conviction can be supported only for '[e]xtremely offensive behavior supporting an inference that the actor wished to provoke the policeman to violence.'" *State* v. *Nelson,* supra, 38 Conn. Sup. 354; accord *Lewis* v. *New Orleans,* supra, 415 U.S. 135 (Powell, J., concurring). Accordingly, we conclude that the trial court properly determined that § 53a-181 (a) (3) was not unconstitutionally overbroad.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and VERTEFEUILLE, Js., concurred.

---

KATZ, J., concurring and dissenting. I agree with part II of the majority opinion in its rejection of the challenge by the defendant, Dante DeLoreto, to General Statutes § 53a-181 (a) (3)[1] as being unconstitutionally vague as applied to him and unconstitutionally overbroad. I agree only in part, however, with part I of the majority opinion addressing the defendant's free speech challenges under the federal and state constitutions[2] to his convic-

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place . . . or (3) threatens to commit any crime against another person or such other person's property . . . ."

[2] The first amendment to the United States constitution, made applicable to the states through the fourteenth amendment, provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

Article first, § 4, of the Connecticut constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article first, § 5, of the Connecticut constitution provides: "No law shall

tion under § 53a-181. Specifically, with respect to the defendant's incident involving Robert Labonte, a Wethersfield police sergeant, I agree with the majority's conclusion that the defendant's conduct was not constitutionally protected, but I would not apply the true threats doctrine; see *United States* v. *Orozco-Santillan*, 903 F.2d 1262, 1265–66 (9th Cir. 1990); because a narrower constitutional ground is applicable. With respect to the defendant's incident involving Andrew Power, also a Wethersfield police sergeant, I agree with the majority that the true threats doctrine applies, but would remand the case to the trial court for the necessary factual determinations.

With respect to the defendant's incident with Labonte, I would not turn to the true threats doctrine, which this court previously has not adopted, because it is unnecessary to do so. Instead, I would affirm the judgment of the trial court on the breach of the peace count involving Labonte on the narrower ground that the defendant violated subsection (a) (1) of § 53a-181, because that provision prohibits "threatening behavior in a public place . . . ." See footnote 1 of this concurring and dissenting opinion. Applying § 53a-181 (a) (1), we can resolve the issue based solely on the defendant's threatening *physical* conduct, i.e., his erratic driving near Labonte, who was jogging at the time of the incident, his attempt to cut off Labonte with his car, his swinging of his car door in the direction of Labonte, and his subsequent advance toward Labonte with his fists raised, without resort to the defendant's speech.

It is well settled "that nonverbal expressive activity can be banned because of the action it entails, but not

ever be passed to curtail or restrain the liberty of speech or of the press."

Article first, § 14, of the Connecticut constitution provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

because of the ideas it expresses . . . ." *R.A.V.* v. *St. Paul*, 505 U.S. 377, 385, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). In the present case, although the defendant contends that there is a nonthreatening interpretation to his *statements*, he does not defend similarly his *conduct*. Accordingly, I disagree that the true threats doctrine should be applied to the defendant's incident with Labonte, but nevertheless I would affirm the trial court's judgment as to the breach of the peace count involving Labonte as threatening behavior under § 53a-181 (a) (1).

On the other hand, I do agree with the majority that the true threats doctrine properly may be applied to the defendant's incident with Power. Unlike the incident with Labonte, the defendant's conduct toward Power consisted principally of verbal, rather than physical, conduct. Nonetheless, I do not agree with the majority's application of the true threats doctrine to the present case. In my view, because application of the doctrine requires a fact-intensive inquiry, we must remand the case for further proceedings, as *the trial court*, and not this court, is the fact finder.

Whether a reasonable person would believe that the defendant's threats were mere hyperbole or jokes "in light of their entire factual context, including the surrounding events and reaction of the listeners"; *United States* v. *Orozco-Santillan*, supra, 903 F.2d 1265; is not a question that this court can decide as a matter of law. The issue in this appeal is not whether there was sufficient evidence in the record to support a determination that the defendant's statements constituted a true threat. Compare *State* v. *Smith*, 262 Conn. 453, 473, 815 A.2d 1216 (2003) (reviewing facts in sufficiency of evidence claim). Because that question never was presented in this case, there has been no factual determination in this regard. Therefore, we are left with a test set forth by the majority that depends upon factual determinations that never have been made.

It is well settled, however, that "[i]t is not the role of this court to make . . . a factual determination. It is in the sole province of the trier of fact to evaluate . . . testimony, to assess its credibility and to assign it a proper weight. . . . Since this is a case of first impression and since the governing standard is one that we have not previously articulated, the trial court is free to consider any additional evidence that the parties may want to present on the issue . . . ." (Citations omitted.) *State* v. *Jarzbek*, 204 Conn. 683, 706–707, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988); see also *United States* v. *Merrill*, 746 F.2d 458, 462–63 (9th Cir. 1984) ("[a] few cases may be so clear that they can be resolved as a matter of law . . . but most cases arising under [18 U.S.C. § 871, threatening the life of the president of the United States] present widely varying fact patterns that should be left to the trier of fact" [citation omitted]); *United States* v. *Carrier*, 672 F.2d 300, 306 (2d Cir.), cert. denied, 457 U.S. 1139, 102 S. Ct. 2972, 73 L. Ed. 2d 1359 (1982) (whether speaker's language constitutes threat is matter to be decided by trier of fact).

Therefore, I disagree with the majority's conclusion that it is appropriate for this court to examine the defendant's conduct in the incident with Power and to determine what a reasonable person would believe in this case. Rather, I would remand the case to the trial court for a new trial, at which time the issue of whether the defendant's speech to Power constituted true threats could be litigated against the entire *factual* background at issue.[3]

---

[3] I note that, in determining whether the defendant's statements were true threats, the majority cites as a relevant fact the defendant's "history of confrontational behavior"—relying on his "giving the finger" to Power, as well as the defendant's lawsuit pending against various Wethersfield police officers. This "confrontational behavior," however, arguably is constitutionally protected speech. I would caution the fact finder, therefore, that, although the entire factual context is to be considered; *United States* v. *Orozco-Santillan*, supra, 903 F.2d 1265; prior constitutionally protected con-

Accordingly, I respectfully concur in part and dissent in part.

duct should not serve as the principal basis for determining the threatening nature of the defendant's subsequent statements.