******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KAHN, J. I agree with and join the majority's opinion, reversing the judgment of the Appellate Court with respect to the conviction of the defendant, David G. Liebenguth, of breach of the peace in the second degree and remanding the case with direction to affirm the trial court's judgment of conviction on that charge. I write separately, however, to reiterate my opinion that "[t]he continuing vitality of the fighting words exception is dubious and the successful invocation of that exception is so rare that it is practically extinct." *State* v. *Parnoff*, 329 Conn. 386, 411, 186 A.3d 640 (2018) (*Kahn, J.*, concurring in the judgment). Despite the diminished scope of the fighting words doctrine, "I assume that the . . . exception remains valid for now, but [remain] . . . mindful that the exception is narrowly construed . . . ." Id., 414. To the extent that the doctrine is viable, I agree with the majority, as well as Justice Ecker's concurring opinion and Judge Devlin's well reasoned view, that when the " 'viciously hostile epithet,' which has deep roots in this nation's long and deplorable history of racial bigotry and discrimination," is used to demean and humiliate a person,[1] it constitutes fighting words. See *State* v. *Liebenguth*, 181 Conn. App. 37, 64–65, 186 A.3d 39 (2018) (*Devlin, J.*, concurring in part and dissenting in part). I also note, in particular, that I disagree with the holding and reasoning of *State* v. *Baccala*, 326 Conn. 232, 241–42 and n.7, 163 A.3d 1, cert. denied,     U.S.    , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017), to the extent that the case stands for the proposition that personal attributes of the addressee such as age, gender, race, and status should be considered when determining whether a reasonable person with those characteristics was likely to respond with violence. Regardless of my ongoing reservations, the majority has correctly applied precedent from the United States Supreme Court and this court to which we remain beholden.

It is axiomatic that the right to free speech is a bedrock principle of the United States, one so essential that the formation of our nation was predicated on its inclusion in the first amendment of the United States constitution. See U.S. Const., amend. I. The right to free speech, however, is not absolute, and the United States Supreme Court has delineated the circumstances under which words fall outside the protections of the first amendment. One such circumstance is speech that constitutes fighting words. The United States Supreme Court first articulated the doctrine in the seminal case of *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). In that case, the court carved out an exception to protections afforded free speech for words "which by their very utterance inflict injury or tend to incite [violence] . . . ." Id.; see

also *Cohen* v. *California*, 403 U.S. 15, 20, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971); *State* v. *Baccala*, supra, 326 Conn. 237. In the more than seventy-five years since *Chaplinsky* was decided, both the United States Supreme Court and the dictates of changing societal norms have diminished the scope and applicability of the fighting words exception.[2] See Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1129 (1993).

The United States Supreme Court has narrowed the application of the fighting words doctrine, including limiting it to "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"; *Cohen* v. *California*, supra, 403 U.S. 20; thereby "seemingly abandon[ing] the suggestion in *Chaplinsky* that there are words that by their very utterance inflict injury . . . ." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 329 Conn. 411–12 (*Kahn, J.*, concurring in the judgment); see also Note, supra, 106 Harv. L. Rev. 1129. Contemporaneous with judicial constriction of the fighting words exception, societal norms have also evolved, rendering "public discourse . . . more coarse . . . [and resulting in] fewer combinations of words and circumstances that are likely to fit within the fighting words exception. Indeed, given some of the examples of egregious language that have not amounted to fighting words following *Chaplinsky*, it is difficult to imagine examples that rise to the requisite level today." (Citation omitted; internal quotation marks omitted.) *State* v. *Parnoff*, supra, 413 (*Kahn, J.*, concurring in the judgment); see also *State* v. *Baccala*, supra, 326 Conn. 239 (calling someone racketeer or fascist, deemed fighting words in *Chaplinsky*, "would be unlikely to even raise an eyebrow today"); *State* v. *Tracy*, 200 Vt. 216, 237, 130 A.3d 196 (2015) ("in this day and age, the notion that *any* set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic" (emphasis in original)).

This judicial constriction, overlaid with current societal norms, calls into question the continued vitality of the fighting words exception. See Note, supra, 106 Harv. L. Rev. 1146. Regardless, "against this small and tortured canvas, the fighting words exception resurfaces occasionally," and the United States Supreme Court "continues to list fighting words among the exceptions to first amendment protection. . . . Therefore, I assume that the fighting words exception remains valid for now, but [remain] . . . mindful that the exception is narrowly construed and poses a significant hurdle for the state to overcome." (Citation omitted.) *State* v. *Parnoff*, supra, 329 Conn. 413–14 (*Kahn, J.*, concurring in the judgment).

When determining whether the fighting words exception applies in a given case, the court must consider both "the words used by the defendant" and "the circumstances in which they were used . . . ." *State* v. *Szymkiewicz*, 237 Conn. 613, 620, 678 A.2d 473 (1996). This court recently stated that "[a] proper examination of context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made." *State* v. *Baccala*, supra, 326 Conn. 241. "[W]hen there are objectively apparent characteristics that would bear on the likelihood of [a violent] response, many courts have considered the average person with those characteristics. Thus, courts also have taken into account the addressee's age, gender, and race." Id., 243. The majority in the present case agrees that, "because the fighting words exception is intended only to prevent the likelihood of an actual violent response, it is an unfortunate but necessary consequence that we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response." (Internal quotation marks omitted.), quoting *State* v. *Baccala*, supra, 249. I disagree with this proposition to the extent that it allows for consideration of the addressee's characteristics beyond "whether the addressee's position would reasonably be expected to cause him or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances" when determining whether he or she would respond violently.[3] *State* v. *Baccala*, supra, 245.

The ultimate inquiry of the fighting words exception is whether a speaker's words would reasonably result in a violent reaction by its intended recipient. See, e.g., *Cohen* v. *California*, supra, 403 U.S. 20. Considering the stereotypes associated with immutable characteristics of the addressee, however, produces discriminatory results "because its application depends on assumptions about how likely a listener is to respond violently to speech." W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 948 (2000). This approach essentially requires courts to promulgate stereotypes on the basis of race, gender, age, disability, ethnicity, and sexual orientation, among others, and has led to much of the scholarly criticism of the fighting words exception. See generally Note, supra, 106 Harv. L. Rev. 1129.

I will refrain from enumerating a laundry list of a stereotypes related to violent responses from which flow myriad discriminatory results, but I illustrate one example of a common refrain in society and courts: women are less likely than men to react to offensive situations with physical violence. Id., 1134. Allowing such a stereotype into the analysis of whether a reason-

able person in the addressee's circumstances is likely to respond to words with violence creates a situation in which "almost nothing one could say to a woman would be proscribed by the fighting words doctrine . . . ." W. Reilly, supra, 52 Rutgers L. Rev. 948. The overarching result is that groups of people that, for example, are stereotyped as docile due to their gender or ethnicity, or who have physical limitations due to their age or disability that prevent them from responding violently—the precise groups that face persistent discrimination—must endure a higher level of offensive speech before being afforded legal remedies that comport with our constitution. From the speaker's perspective, such a result allows him or her to more readily and viciously verbally assault certain oppressed groups without fear of criminal prosecution.

Although I have strong reservations about the viability and application of the fighting words doctrine because it leads to consideration of stereotypical propensities for violence when assessing an addressee's likely response to the speaker's words, I recognize that the fighting words exception remains binding United States Supreme Court precedent. As such, I agree with the majority's conclusion that the defendant's use of the phrases "fucking niggers" and to "remember Ferguson" during his encounter with Michael McCargo were likely to provoke a violent response from a reasonable person under the circumstances and, therefore, constituted fighting words not entitled to protection under the first amendment. Although there are no per se fighting words, and statements must be assessed in the context in which they are made, the highly offensive, degrading, and humiliating racial slur that the defendant used is one of the most volatile terms in the English language, and, therefore, it does not stretch logic to conclude that its use in this context would likely cause a reasonable person to respond with violence.

For the foregoing reasons, I respectfully concur.

[1] I completely agree with the majority that the racial epithet is particularly demeaning and hostile when used toward an African-American person, thereby likely to provoke a violent reaction. I would not, however, preclude a situation in which the same language directed at a non-African American could result in a similar reaction. By way of example, if the same racial slurs were directed with the same intent to an African-American child in the presence of her or his non-African-American parent, that parent may have a similar visceral reaction of violence.

[2] Even if the fighting words doctrine were obsolete, the defendant's conduct could have constituted a violation under other provisions of our criminal statutes, such as General Statutes § 53a-181 (a) (1). In this case, the state charged the defendant with breach of the peace under § 53a-181 (a) (5), the provision that proscribes speech. The defendant, however, engaged in both speech and conduct that could have supported a charge under § 53a-181 (a) (1), which provides that "[a] person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place . . . ." Alternatively, the state could also have charged the defendant with disorderly conduct under General Statutes § 53a-182 (a) (1) or (2). Although "the correct application of the exception to first amendment protection is not based on the charge or charges leveled against the defendant but, rather,

on the state's theory of the case," by focusing on speech only, the state relied on the fighting words, rather than the true threat, exception to first amendment protection. *State* v. *Parnoff*, supra, 329 Conn. 407 (*Kahn, J.*, concurring in the judgment). The point remains that it is the state that determines on which charge and on which exception to first amendment protection it chooses to rely. The state should consider the wisdom of continuing to pursue a doctrine that has been often criticized and rarely upheld.

[3] I observe that the United States Supreme Court has suggested that whether the addressee is a police officer should be considered because "a properly trained officer *may* reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." (Emphasis added; internal quotation marks omitted.) *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987), quoting *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring in the result); see also *State* v. *Baccala*, supra, 326 Conn. 263–64 (*Eveleigh, J.*, concurring in part and dissenting in part). "Nevertheless, this court has expressly adopted a narrower application of the fighting words standard for speech addressed to police officer[s]," at least in some contexts. *State* v. *Baccala*, supra, 264 (*Eveleigh, J.*, concurring in part and dissenting in part); see also *State* v. *DeLoreto*, 265 Conn. 145, 163, 827 A.2d 671 (2003) ("a narrower class of statements constitutes fighting words when spoken to police officers, rather than to ordinary citizens, because of the communicative value of such statements"). To the extent that these cases do not rely on stereotypes related to an addressee's race, gender, age, disability, ethnicity, sexual orientation, or other immutable characteristics, they do not raise the concerns typically associated with the application of the doctrine.