D'AURIA, J.
**388 The defendant, Laurence V. Parnoff, uttered threatening words to two water company employees who had entered his property pursuant to an easement to service a fire hydrant-telling them, essentially, that if they did not leave his property, he would retrieve a gun and shoot them. As a result of his statement, the defendant was convicted after a jury trial of disorderly conduct in violation of General Statutes § 53a-182 (a) (1), which criminalizes intentionally or **389 recklessly causing inconvenience, annoyance, or alarm by way of "violent, tumultuous or threatening behavior ...." The defendant appealed to the Appellate Court from the judgment of conviction, arguing that, under principles stemming from the first amendment to the United States constitution, there was insufficient evidence to sustain a guilty verdict as to the disorderly conduct charge. State v. Parnoff , 160 Conn. App. 270, 274, 125 A.3d 573 (2015). Because the behavior giving rise to his conviction was pure speech and not physical violence, the first amendment forbids the imposition of criminal sanctions unless that speech amounts to so-called "fighting words"-words that would cause a reasonable addressee to respond with imminent violence under the circumstances. (Internal quotation marks omitted.) State v. Baccala , 326 Conn. 232, 234-35, 251, 163 A.3d 1, cert. denied, --- U.S. ----, 138 S.Ct. 510, 199 L.Ed.2d 408 (2017) ; see also U.S. Const., amend. I. The Appellate Court reversed the judgment after concluding that the defendant's statement was not fighting words because, although inappropriate, the defendant's words were not likely to provoke an immediate and violent reaction from the water company employees. State v. Parnoff , supra, at 281, 125 A.3d 573. We agree with the Appellate Court and affirm its judgment.
The jury reasonably could have found the following facts. On the day of the incident, two employees of the Aquarion Water Company (water company) were sent to the defendant's property to perform fire hydrant maintenance. One of the two employees, Kyle Lavin, was an apprentice level employee working his fourth summer for the water company performing hydrant maintenance. Lavin needed assistance locating a fire hydrant on the defendant's property that he was scheduled to routinely service, and he called *644 fellow water company employee David Lathlean to help him. Lathlean was an experienced employee, having worked for **390 the water company for approximately ten years. Although the fire hydrant was located on the defendant's private property, the water company had a preexisting easement that spanned a radius of twenty feet beyond the fire hydrant and hydrant pipe.[1]
Lavin and Lathlean arrived at the defendant's property in separate company branded trucks, wearing bright yellow company branded safety shirts and identification badges. They entered the property together and located the hydrant down a long driveway through a wooded area, approximately 100 feet from the defendant's residence. Upon inspecting the fire hydrant, Lavin and Lathlean discovered that one of its caps was missing. They then began to look for the cap in the vicinity of the hydrant, including in an open-ended shed with a canopy roof located several yards away. Lathlean entered the open-ended shed and discovered the hydrant's missing cap, which appeared to have a garden hose fitting welded into it. This indicated to Lathlean that someone had tampered with the hydrant because the water company does not permit the removal or modification of hydrant caps. As a result, the two employees called another water company employee, Beverly Doyle, who handled theft of service investigations.
Shortly thereafter, the defendant's daughter, who had just arrived at the property to visit her parents, and the defendant's wife were approached by the water company employees. Lathlean first spoke to the defendant's daughter, conveying to her that he suspected someone had tampered with the hydrant. The daughter testified that Lathlean was "[n]ot very nice, loud," and "angry."
**391 The defendant then appeared and approached Lavin and Lathlean to confront them about their presence on the property. The defendant was wearing shorts and no shirt, and he appeared disheveled. He was also carrying a can that he was using to collect worms from the ground in order to go fishing with his grandson, who was elsewhere on the property. Lavin looked on as Lathlean explained to the defendant that they were employed by the water company to perform hydrant maintenance and had discovered the altered hydrant cap. According to Lavin, the defendant was very upset, throwing his arms up and down, yelling, and he told them to leave his property multiple times.
Despite Lathlean's explanation, the defendant told Lavin and Lathlean that they had no right to be on his property. According to Lathlean, the defendant then told him that, "if [they] didn't get off his property, he was going to get a gun or something like that ... [t]o shoot [them]." Although the defendant did not speak directly to Lavin, Lavin testified that he heard the defendant say, " 'if you go into my shed, I'm going to go into my house, get my gun and [fucking] kill you.' "[2]
Lathlean called the police, but the two employees remained on the property, even though they were trained by the water company to leave if a property owner became angry. Lathlean gave no outward reaction to the defendant's statement, testifying that "it just bounced right off [of]
*645 me" and that "I just stood there and was like, okay then, you know, let's see what happens." Lathlean also testified that he was not frightened by the defendant's words. In fact, when Lathlean called the police, he referred to the defendant as merely " 'a little crabby' " and did not report anything about a gun. Although Lavin testified that the defendant's words **392 "[a]bsolutely" caused him alarm and trepidation, like Lathlean, he remained on the property. Nothing in Lavin's testimony indicated that he believed that the defendant was armed, and, thus, it did not appear that he was immediately capable of carrying out the threat. The defendant made no effort to return to his house to retrieve a gun.
After making the gun comment, the defendant walked away from Lavin and Lathlean and toward a nearby, fenced off animal pen. Lathlean began following the defendant around his property as the defendant continued to search for worms to collect. The defendant continued to repeatedly ask Lavin and Lathlean to leave his property. Around this time, Doyle arrived to investigate possible water contamination as a result of the tampering, and the defendant told her to leave the property too.
After Lathlean called the police, the defendant also called the police himself to report the incident. When the police officers arrived, the defendant admitted he had told Lavin and Lathlean he would shoot them with a gun. The officers repeatedly asked the defendant to step back so that they could privately interview the water company employees. When the defendant repeatedly refused to leave the immediate area, he was arrested. He was later charged with disorderly conduct in violation of § 53a-182 (a) (1) and fourth degree criminal mischief in violation of General Statutes § 53a-117a (a) (1) for tampering with the fire hydrant. The jury found the defendant not guilty of criminal mischief but found him guilty of disorderly conduct.
The defendant appealed to the Appellate Court, which reversed the judgment of conviction, remanded the case to the trial court, and directed that court to render a judgment of acquittal on the disorderly conduct charge. After reviewing the entire record, the Appellate Court concluded that the state had failed to present **393 sufficient evidence to establish beyond a reasonable doubt that the defendant's statements were likely to provoke an immediate violent reaction, and, thus, they were not fighting words. State v. Parnoff , supra, 160 Conn. App. at 281, 125 A.3d 573.
We granted the state's petition for certification to appeal, limited to the following question: "Did the Appellate Court correctly determine, in its de novo review of the record, that there was insufficient evidence to support the defendant's conviction of disorderly conduct pursuant to ... § 53a-182 (a) (1) because the state's proof of that offense's threat element did not satisfy the first amendment's 'fighting words' doctrine?" State v. Parnoff , 320 Conn. 901, 901-902, 127 A.3d 185 (2015). Reviewing the record ourselves, we agree with the Appellate Court that there was insufficient evidence to sustain the defendant's conviction.
The defendant was convicted of violating § 53a-182 (a) (1), which provides in relevant part that a person is guilty of disorderly conduct when, "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person ... [e]ngages in fighting or in violent, tumultuous or threatening behavior ...." The "behavior" giving rise to the conviction can consist of either physical actions or pure speech not accompanied by physical actions.
*646 State v. Szymkiewicz , 237 Conn. 613, 618-20, 678 A.2d 473 (1996), citing State v. Indrisano , 228 Conn. 795, 811-12, 640 A.2d 986 (1994). When the behavior giving rise to the conviction is pure speech, as in the present case, the disorderly conduct statute intersects with the first amendment, which is applicable to the states through the fourteenth amendment to the federal constitution; State v. Moulton , 310 Conn. 337, 348, 78 A.3d 55 (2013) ; and prohibits laws "abridging the freedom of speech ...." U.S. Const., amend. I.
**394 The first amendment bars the states from criminalizing pure speech, unless that speech falls into one of a few constitutionally unprotected categories. State v. Moulton , supra, 310 Conn. at 348-49, 78 A.3d 55. Therefore, the disorderly conduct statute can proscribe "[o]nly certain types of narrowly defined speech [that] are not afforded the full protections of the first amendment, including fighting words ...." (Internal quotation marks omitted.) State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1.
"Fighting words" are defined as speech that has "a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." (Internal quotation marks omitted.) Id. To qualify as unprotected fighting words, the speech must be "likely to provoke an imminent violent response from the [addressee]." (Emphasis added.) Id., at 251, 163 A.3d 1. The imminence of a response is based on "the likelihood of actual violence, [and] not [merely] an undifferentiated fear or apprehension of disturbance ...." (Emphasis omitted; internal quotation marks omitted.) Id., at 248, 163 A.3d 1. Fighting words must immediately cause the addressee to resort to violence such that the speech is "akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.) Id., at 252, 163 A.3d 1.
The first amendment also does not protect speech that qualifies as "[t]rue threats." State v. Pelella , 327 Conn. 1, 10, 170 A.3d 647 (2017). "True threats encompass those statements [in which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group ...." (Internal quotation marks omitted.) Id. The state, however, did not pursue a true threats theory of criminal liability.[3] Accordingly, like **395 the jury, we have no occasion to determine whether the defendant's utterance qualified as a "true threat," and, therefore, we analyze this case solely under the fighting words doctrine.
In assessing whether the defendant's conviction was proper because his statements were fighting words, we undertake a two part sufficiency of the evidence test, which includes an independent review of the record due to the fact that the defendant's first amendment rights are implicated.
*647 State v. Baccala , supra, 326 Conn. at 250-51, 163 A.3d 1. First, "we construe the evidence in the light most favorable to sustaining the verdict.... Second, we determine whether the trier of fact could have concluded from those facts and reasonable inferences drawn therefrom that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Citation omitted.) Id., at 250, 163 A.3d 1.
In certain cases involving the regulation of free speech, such as this one, we "apply a de novo standard of review [as] the inquiry into the protected status of ... speech is one of law, not fact.... As such, an appellate court is compelled to examine for [itself] the ... statements [at] issue and the circumstances under which they [were] made to [determine] whether ... they ... are of a character [that] the principles of the [f]irst [a]mendment ... protect [them]." (Internal quotation marks omitted.) State v. Krijger , 313 Conn. 434, 446, 97 A.3d 946 (2014). Therefore, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that **396 the judgment does not constitute a forbidden intrusion [in] the field of free expression." (Internal quotation marks omitted.) Id.
This independent scrutiny, however, "does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted [fighting words], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." Id., at 447, 97 A.3d 946. In determining what credibility determinations the jury likely made, we take the version of the facts that most supports the verdict. See id., at 447-48, 97 A.3d 946. In this case, the jury found the defendant guilty of disorderly conduct, so we may presume that the jury credited either Lavin's or Lathlean's testimony, which was consistent with the defendant's statement to police admitting that he had uttered words of a threatening nature. See State v. Parnoff , supra, 160 Conn. App. at 273-74, 125 A.3d 573.
We recently undertook such an analysis and expounded on the scope of the fighting words doctrine in State v. Baccala , supra, 326 Conn. at 238, 163 A.3d 1,[4] explaining that "there are no per se fighting words." Instead, we must consider "the quality of the words themselves," as well as "the manner and circumstances in which the words were spoken ...." (Internal quotation marks omitted.) Id., at 239-40, 163 A.3d 1. In Baccala , a grocery store customer berated a store manager using extremely vulgar terms, including "fat ugly bitch," "cunt," and "fuck you ...." (Internal quotation marks omitted.) Id., at 235, 236, 163 A.3d 1. We stated that, "[e]ven when words are threatening on **397 their face, careful attention must be paid to the context ... to determine if the words may be objectively perceived as threatening." (Internal quotation marks omitted.) Id., at 246, 163 A.3d 1. Our decision in Baccala further emphasized that we must undertake a fighting words analysis with a "case-by-case," "contextual" examination; id., at 245-46, 163 A.3d 1 ; that requires "consideration of the actual circumstances *648 as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation." Id., at 240, 163 A.3d 1.
This analysis "necessarily includes a consideration of a host of factors." Id. One factor is "those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made.... Courts have, for example, considered the age, gender, race, and status of the speaker." (Citations omitted.) Id., at 241-42, 163 A.3d 1. In other words, the reasonable person standard includes an analysis of the "objectively apparent characteristics" of a speaker and addressee that would bear on the likelihood of an imminently violent response to the speaker's words. Id., at 243, 163 A.3d 1. The context also includes consideration of the "attendant circumstances," such as "the manner in which the words were uttered, [and] by whom and to whom the words were uttered ...." Id., at 250, 163 A.3d 1. Particularly, this objective standard "properly distinguishes between the average citizen"; id., at 243, 163 A.3d 1 ; and someone in a position who "would reasonably be expected to ... exercise a higher degree of restraint ...." Id., at 245, 163 A.3d 1 ; see id., at 250, 163 A.3d 1 (concluding that objective "inquiry must focus on the perspective of an average store manager").
Applying these principles to the present case, we are not persuaded that the defendant's threatening words, unaccompanied by any effectuating action, were likely to provoke an imminent and violent reaction from the **398 water company employees at whom those words were directed.
We examine first the nature and "quality of the words" that the defendant used and how that bears on the likelihood of imminent violence. (Internal quotation marks omitted.) Id., at 239, 163 A.3d 1. The defendant's statement, even though conditional, could no doubt be understood as threatening. See State v. Pelella , supra, 327 Conn. at 16 n.15, 170 A.3d 647 (conditional nature of threat does not preclude it from being considered threat for first amendment purposes). In the context of true threats, conditioning an intentional threat to do harm on some uncertain act or omission does not necessarily cleanse it of its threatening nature. Instead, "[t]o the extent that a threat's conditionality is relevant, we look to whether the threat nonetheless constitutes a serious expression of intent to harm." Id. We believe this proposition is also instructive in the fighting words context, as we examine how a reasonable addressee would have interpreted and reacted to the defendant's utterance. See State v. Baccala , supra, 326 Conn. at 245, 163 A.3d 1.
In this case, it is reasonable to presume that an addressee in the position of the water company employees would understand the defendant's statement to be threatening, even though it was conditioned on further action or inaction by the water company employees. The defendant indicated he was going to retrieve a gun and either "shoot" or "[fucking] kill" the employees if they remained on his property or went into his shed. A reasonable person hearing either version would likely recognize its threatening nature. Therefore, we do not doubt that, under certain circumstances, such a statement could provoke a reasonable person to retaliate with physical violence to prevent the threat from being carried out.
Nevertheless, even though threatening, we do not believe that the defendant's statement, considered in **399 context, was likely to provoke an immediate and violent *649 reaction because the objectively apparent circumstances did not indicate any immediate intent or ability on the part of the defendant to carry out that threat. The evidence established that the defendant was walking around, wearing only shorts, carrying what appeared to be a can of worms, and otherwise appeared to be unarmed. These facts indicate that the defendant would need to retrieve a gun to carry out his threat, suggesting his gun was at a different location and decreasing the likelihood that an addressee would consider any danger so imminent that he would feel compelled to react with violence to dispel it. The defendant was not heading in the direction of his residence, which was located approximately 100 feet away, where, by one account of the defendant's statement, he had said his gun was located. Instead, the defendant began walking toward his animal pen while searching for worms. Given that the defendant was in the presence of his family and did not appear to have the immediate ability to carry out his threat, his utterance was unlikely to constitute a serious expression of intent to harm. Therefore, we doubt that the defendant's statements, considered in context, would be viewed as so threatening that they would incite the average person in the water company employees' positions to imminent violence.
The improbability of a violent response is further supported by examining the "personal attributes of the ... addressee[s] that are reasonably apparent ...." State v. Baccala , supra, 326 Conn. at 241, 163 A.3d 1. In this case, Lavin and Lathlean were professionals performing duties on behalf of the water company and acting within the scope of their employment. Their status as employees was readily identifiable, as they wore "bright yellow safety shirt[s]" with "Aquarion Water Company" printed on them and openly visible identification badges. As professionals, the nature of their daily work required them **400 to service hydrants using easements over private land without prior notice. This could precipitate encounters with confrontational property owners as part of their work. But because they were acting as professionals representing the water company, they "would reasonably be expected to ... exercise a higher degree of restraint than the ordinary citizen" and, thus, would be unlikely to react violently when faced with angry property owners. State v. Baccala , supra, at 245, 163 A.3d 1 ; see id., at 250, 252-53, 163 A.3d 1 (concluding that objective "inquiry must focus on the perspective of an average store manager").
Lathlean's and Lavin's heightened level of professional restraint undercuts the state's contention that the average employee in either of their positions would strike the defendant first to either forestall violence or, under the state's more strained argument, to respond to the "humiliating" and "insulting" nature of the threat. In Baccala , we noted that the store manager's role required her to handle customer service matters and thus she was "routinely confronted by disappointed, frustrated customers who express themselves in angry terms ...." State v. Baccala , supra, 326 Conn. at 253, 163 A.3d 1. We then concluded that the average manager would be "expected to defuse hostile situations ... [and] model appropriate ... behavior, aimed at de-escalating the situation ...." Id. Although the addressees in the present case were not in direct customer service roles, they too would be accustomed to interacting with confrontational property owners-the water company's customers-and, similarly, be expected to model appropriate, de-escalating behavior.
The concurrence contends that our analysis "focuses too heavily" on the *650 "job duties of the addressees ... effectively extending one of the holdings of Baccala ," which the concurrence finds "distinguishable from the present case ...." See part II of the concurring opinion. We agree with the concurrence that this case is **401 different from Baccala in that the addressees in the present case "had little control over the premises," but we find that difference does not militate against any consideration of the addressees' job performance as part of the required contextual analysis. After all, the fighting words doctrine dictates that we consider the context of the speech and the "attendant circumstances" when deciding whether the utterance would cause immediate violence from the average addressees. State v. Baccala , supra, 326 Conn. at 250, 163 A.3d 1.[5] Notably, this objective standard "properly distinguishes between the average citizen" and someone in an employment position; id., at 243, 163 A.3d 1 ; who "would reasonably be expected to ... exercise a higher degree of restraint ...." Id., at 245, 163 A.3d 1. Thus, our analysis does not attempt to "equat[e]" the two employment circumstances as the concurrence claims, but, rather, it simply considers-properly-as one of the "objectively apparent characteristics" of the addressees; State v. Baccala , supra, at 243, 163 A.3d 1 ; that they were water company employees, tasked with entering strangers' properties, who would "be expected to ... exercise a higher degree of restraint," though perhaps to a lesser extent than the average grocery store manager. Id., at 244, 163 A.3d 1.
The state argues that the average addressee would have reacted with immediate violence because of the secluded, wooded nature of the defendant's property. The state contends this would cause the average addressee to feel "vulnerable" and "exposed," and, thus, **402 more likely to strike the defendant to forestall violence. It is true that, in Baccala , we considered it significant that the store manager had "a degree of control over the premises where the confrontation took place." State v. Baccala , supra, 326 Conn. at 253, 163 A.3d 1. Seclusion alone, however, does not in our view elevate the circumstances in the present case so as to satisfy the imminent violence threshold. An average water company employee working in the field in Connecticut would routinely be present on private property in many settings, including in wooded areas, while interacting with irritable property owners. The mere secluded nature of the defendant's property does not convince us that the employees were likely to react with imminent violence, particularly given that there were two of them present and a third on her way.
The state also contends that the average addressee would have been provoked to violence in order to " 'beat [the defendant] to the punch,' " or, in other words, preemptively forestall the defendant from carrying out his threat. We recognize that, although the imminent violence standard is objective, of course certain individuals might, under these circumstances, physically *651 react to forestall gun violence. Although this type of preemptive self-defense is feasible, so are a variety of other responses, such as retreat or de-escalating the confrontation. Ultimately, we conclude that the defendant's utterance falls short of provoking the average person in these workers' positions to react with immediate violence.[6]
A subjective analysis of the addressees' actual reactions confirms our conclusion that it was unlikely that **403 imminent violence would follow from the defendant's words. Though the fighting words standard is an objective inquiry, our decision in Baccala underscored that examining the subjective reaction of an addressee, although "not dispositive," may be "probative of the likelihood of a violent reaction." State v. Baccala , supra, 326 Conn. at 254, 163 A.3d 1. Here, Lathlean gave no reaction whatsoever-let alone a violent one. He testified that, not only was he not frightened by the defendant's words, but, rather, they "bounced right off" him, stating that, "I just stood there and was like, okay then, you know, let's see what happens." Lathlean then proceeded to follow the defendant around the property, even though he was trained to retreat in the event that he encountered an angry property owner. In fact, when Lathlean called the police, he characterized the defendant as merely " 'a little crabby' " and made no mention at all of the defendant's gun threat. Although Lavin acknowledged that the defendant's words caused him "alarm" and "trepidation," he too did not outwardly react or leave the premises. Given that the addressees' subjective reactions amounted to no reaction at all, their dispassion supports our independent conclusion that average water company employees in Lathlean's and Lavin's circumstances who were confronted by the defendant's threatening words, unaccompanied by any effectuating action, and who are trained to retreat from hostile situations, would not likely be incited to react imminently and violently. Therefore, the defendant's comments do not qualify as unprotected fighting words, and there is insufficient evidence to sustain his conviction.
The state also asserts that the Appellate Court erroneously failed to consider the defendant's visible volatility and, thus, failed to recognize the similarities between this case and, among others, State v. Szymkiewicz , supra, 237 Conn. at 613, 678 A.2d 473. We recognize that the testimony in this case reflects that the defendant was in fact "irate," "throwing his arms up and down, yelling," and "very **404 upset." Visible manifestations of anger, however, coupled with the defendant's threatening comments, do not, under these particular circumstances, meet the high threshold of imminence required for the fighting words exception. In Szymkiewicz , the defendant did make threatening comments that contributed to our conclusion that they were fighting words, but that case is not analogous to the present one because, in Szymkiewicz , there was additional inflammatory speech and circumstances. State v. Szymkiewicz , supra, at 615-16, 678 A.2d 473.
In addition to making a threat, the defendant in Szymkiewicz also loudly cursed, shouted epithets, and sparked significant commotion in a gathering crowd. Id., at 615-16, 623, 678 A.2d 473. Specifically, the defendant loudly barked "[f]uck you" several times and said, "[y]ou fucking bitch. I *652 hope you burn in hell for all eternity." (Internal quotation marks omitted.) Id., at 615-16, 678 A.2d 473. The defendant also made a threat, and caused a crowd to form and a commotion among the crowd. Id. Unlike in the present case, it was the "cumulative force" of "[t]he combination" of words and, particularly, the consequent crowd commotion that elevated those comments to fighting words. Id., at 623, 678 A.2d 473. Notably, these collective elements "could have aroused a violent reaction by not only [the addressee], but also the crowd "; (emphasis added) id. ; and, thus, the present case is not controlled by Szymkiewicz despite sharing the common element of threatening words.
We emphasize, as we did in Baccala , that we do not suggest that threatening words directed at a water company employee, or anyone else, may never constitute fighting words.[7]
**405 State v. Baccala , supra, 326 Conn. at 256, 163 A.3d 1. We also do not suggest that these particular threatening words would not otherwise be criminal as a true threat.[8] But given that this utterance was not fighting words and the state did not pursue a true threats theory of liability in the present case, we cannot conclude that the words uttered by the defendant in this context were criminal.
The dissent concludes that the defendant's utterance constitutes fighting words because he "introduced the prospect of firearms into [the] exchange," and, thus, "he escalated the confrontation beyond [servicing the hydrant] to first amendment protection." We agree that the defendant's words are of a different character than those in Baccala , and we understand and appreciate the dissent's efforts to signal the potentially criminal nature of gun threats. As we have discussed, a true threat has no value in the marketplace of ideas, and we do not mean to convey that the defendant's words, therefore, necessarily enjoy absolute first amendment protection.
To use the dissent's phrase, however, we are unwilling to force a "square peg [into a] round hole" by using an ill-fitting legal doctrine. See footnote 4 of the dissenting opinion. The state pursued this case as a fighting words case-not a true threats case-and the jury was not charged under the true threats doctrine.[9]
*653 See text **406 accompanying footnote 3 of this opinion. Whatever vitality remains to the fighting words doctrine; see, e.g., S. Gard, "Fighting Words as Free Speech," 58 Wash. U.L.Q. 531, 580-81 (1980); we conclude that the threat in this particular case-by a shirtless man collecting worms with his wife and daughter nearby-simply did not rise to Baccala 's necessarily high standard of being "likely " to provoke "immediate " violence. (Emphasis added; internal quotation marks omitted.) State v. Baccala , supra, 326 Conn. at 239, 163 A.3d 1.
Consistent with the first amendment, therefore, we cannot conclude those statements constituted fighting words. Accordingly, we affirm the judgment of the Appellate Court and its remand order, directing the trial court to render a judgment of acquittal as to the charge of disorderly conduct.
The judgment of the Appellate Court is affirmed.
In this opinion PALMER, McDONALD and MULLINS, Js., concurred.
KAHN, J., concurring in the judgment.
**407 I concur in the result reached by the majority, affirming the judgment of the Appellate Court reversing the trial court and remanding the case with direction to render a judgment of acquittal on the charge of disorderly conduct. I also agree with the majority that the statement of the defendant, Laurence V. Parnoff, does not fall within the fighting words exception to first amendment protection because a reasonable person in the position of the addressees would not have been provoked to violent retaliation under the circumstances of the present case.
I write separately, however, to highlight where my reasoning diverges from that of the majority. First, I think that focusing on the threatening nature of the speech to determine if it falls within the fighting words exception conflates two related but distinct exceptions to first amendment protection of speech: fighting words and true threats. Second, I think that the nature of the addressees' employment in the present case is distinguishable from that of the addressee in State v. Baccala , 326 Conn. 232, 163 A.3d 1, cert. denied, --- U.S. ----, 138 S.Ct. 510, 199 L.Ed.2d 408 (2017), and I therefore would not rely on the scope of the addressees' job duties in concluding that the defendant's statement did not amount to fighting words. I would reach that conclusion based on the content of the statement, under the circumstances of the present case. Third, the correct application of the exception to first amendment protection is not based on the charge *654 or charges leveled against the defendant but, rather, on the state's theory of the case. The state could have relied on the true threats exception because the language of the disorderly conduct statute under which the defendant was charged encompasses true threats. See General Statutes § 53a-182 (a) (1). Nevertheless, by failing to articulate a true threats theory, the state forfeited any such claim. Instead, the state's case erroneously relied on a claim **408 that the defendant's statement constituted fighting words. Accordingly, I respectfully concur.
I agree with the facts and procedural history as set forth in the majority opinion. The defendant stated to two water company employees either "if you go into my shed, I'm going to go into my house, get my gun and [fucking] kill you," or, that if the addressees did not leave his property, he was "going to get a gun or something like that ... to shoot" them. Intuitively, both statements are threats. See, e.g., American Heritage College Dictionary (4th Ed. 2007) (defining "threat" as "[a]n expression of an intention to inflict pain, injury, evil, or punishment"). Indeed, the state charged the defendant under § 53a-182 (a) (1), which provides that "[a] person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person ... [e]ngages in fighting or in violent, tumultuous or threatening behavior ...." (Emphasis added.) Nevertheless, the state consistently argued that the defendant's statement was exempt from first amendment protection not because it was a true threat, but because it amounted to fighting words, because it was threatening.
This convoluted argument has obfuscated the issues in the present case throughout its pendency. For example, in his closing argument before the jury, the prosecutor claimed that "if the conduct consists purely of speech ... the speech must contain fighting words that would have a direct tendency to inflict injury or cause acts of violence." Accordingly, the trial court instructed the jury on the fighting words exception.[1] At oral argument before this court, the state conceded that **409 its theory of the case was one of fighting words, not true threats. As a result of these rhetorical and strategic choices, the state conflated the fighting words and true threats exceptions to first amendment protection, and effectively swapped a viable exception for an inapplicable one.
In light of this confusion, before setting forth my analysis of the issues presented in this appeal, I will summarize the relevant law and background. First, I note that I concur with the majority's conclusion that the standard of review is de novo.
The state's confusion is understandable, given that true threats and fighting words are closely related in two important respects. First, true threats and fighting words are both exceptions to the protection afforded speech by the first amendment. See U.S. Const., amend. I ; United States v. Alvarez , 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012). Second, both the fighting words and true threats exceptions are grounded in distaste for violence and concern over the effect of words on the listener. Compare *655 State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1 (defining fighting words as those that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed" [internal quotation marks omitted] ), and State v. Krijger , 313 Conn. 434, 449, 97 A.3d 946 (2014) ("a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders" [internal quotation marks omitted] ). The exceptions are different in other crucial ways, however, and I provide further exposition on each in turn.
True threats "encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.... The speaker need not actually intend to carry **410 out the threat." (Internal quotation marks omitted.) State v. Krijger , supra, 313 Conn. at 449, 97 A.3d 946. "In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard-whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.... [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Internal quotation marks omitted.) Id., at 450, 97 A.3d 946. "[A] prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Internal quotation marks omitted.) Id., at 449, 97 A.3d 946. In other words, the concern behind the true threats exception is that a threatening statement will cause a listener to fear violence.
In contrast, fighting words are "those words that have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." (Internal quotation marks omitted.) State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1. Unlike true threats, the fighting words exception is driven by the concern that an offensive statement will cause "violent retaliation" by the listener. Id., at 243, 163 A.3d 1.
"The fighting words exception was first articulated in the seminal case of [ Chaplinsky v. New Hampshire , 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ]." State v. Baccala , supra, 326 Conn. at 237, 163 A.3d 1. In Chaplinsky , the United States Supreme Court upheld the conviction of Walter Chaplinsky under a New Hampshire statute that criminalized addressing "any offensive, derisive or annoying word to any other person" in a public place. (Internal quotation marks omitted.)
**411 Chaplinsky v. NewHampshire , supra, at 569, 62 S.Ct. 766. On a public sidewalk, Chaplinsky called the complainant a " 'God damned racketeer' " and " 'a damned Fascist ....' " Id. The court held that the statements were unprotected fighting words: "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id., at 572, 573-74, 62 S.Ct. 766.
Today, "the fighting words exception is intended only to prevent the likelihood of an actual violent response"; State v. Baccala , supra, 326 Conn. at 249, 163 A.3d 1 ; and a "proper contextual analysis requires consideration of ... whether there was a likelihood of violent retaliation." Id., at 240, 163 A.3d 1. As a result, "there are no per se fighting words; rather, courts must determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond *656 with violence." Id., at 245, 163 A.3d 1.
The continuing vitality of the fighting words exception is dubious and the successful invocation of that exception is so rare that it is practically extinct. See id. ("the Supreme Court has not considered the fighting words exception as applied to any addressee in more than twenty-five years"). Indeed, the United States Supreme Court has not upheld a fighting words conviction since Chaplinsky . See Note, " The Demise of the Chaplinsky Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1129 (1993) ("[i]n the fifty years since Chaplinsky , the [c]ourt has never upheld another speaker's conviction under the 'breach of the peace' prong of the fighting words doctrine").
The Supreme Court has also added additional criteria to the fighting words exception since Chaplinsky , "narrow[ing] its scope." Id. Most obvious, the court has seemingly abandoned the suggestion in Chaplinsky that there are words that " 'by their very utterance inflict **412 injury,' " and it has never used that "dictum" to "uphold a speaker's conviction." Id. Thus, statements are fighting words only if they are "likely to provoke violent reaction." Cohen v. California , 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Furthermore, to be fighting words, statements must be directed toward an "individual actually or likely to be present"; id. ; and amount to "a direct personal insult or an invitation to exchange fisticuffs." Texas v. Johnson , 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).
Recently, this court narrowed the fighting words exception in Baccala , holding that "we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response." State v. Baccala , supra, 326 Conn. at 249, 163 A.3d 1. In Baccala , the defendant had been convicted of breach of the peace in the second degree in connection with her tirade against an assistant store manager at a supermarket. Id., at 233-35, 163 A.3d 1. Although the defendant had called the manager a " 'fat ugly bitch' " and a " 'cunt,' " this court concluded that "[s]tore mangers are routinely confronted by disappointed, frustrated customers who express themselves in angry terms, although not always as crude as those used by the defendant." Id., at 236, 253, 163 A.3d 1. As a result, the fighting words exception did not apply, "[b]ecause the words spoken by the defendant were not likely to provoke a violent response under the circumstances in which they were uttered ...." Id., at 234, 163 A.3d 1. This court reversed the trial court's judgment and remanded the case with direction to render a judgment of acquittal. Id., at 257, 163 A.3d 1.
Despite the increasing judicial constriction of the fighting words exception, perhaps nothing has diminished the scope of its applicability as much as changing societal norms. See id., at 239, 163 A.3d 1 (observing that "public discourse has become more coarse" and speculating about **413 resulting impact on fighting words exception). As certain language is acceptable in more situations, the borders of the fighting words exception contract. See Eaton v. Tulsa , 415 U.S. 697, 700, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974) (Powell, J., concurring) ("[l]anguage likely to offend the sensibility of some listeners is now fairly commonplace in many social gatherings as well as in public performances"). For example, "[w]hile calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when Chaplinsky was decided, those same words would be unlikely to even raise an *657 eyebrow today." State v. Baccala , supra, 326 Conn. at 239, 163 A.3d 1. As "public discourse has become more coarse"; id. ; there are fewer combinations of words and circumstances that are likely to fit within the fighting words exception. Indeed, given some of the examples of egregious language that have not amounted to fighting words following Chaplinsky , it is difficult to imagine examples that rise to the requisite level today. See, e.g., id., at 236, 163 A.3d 1 (holding that " 'fat ugly bitch' " and " 'cunt,' " when directed to supermarket manager, did not amount to fighting words); Owens v. State , 848 So.2d 279, 279-80 (Ala. Crim. App. 2002) (holding that fighting words exception did not apply where defendant, in WalMart store, called addressees " 'churchgoing hypocrites,' " and said of their terminally ill family member, " '[o]ne of those hypocrites is fixing to bust hell wide open ... [a]nd it's not gonna be too much longer I hear' "). Thus, for statements to rise to the rarified level of fighting words today, they must be "akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.) State v. Baccala , supra, at 252, 163 A.3d 1.
Yet, against this small and tortured canvas, the fighting words exception resurfaces occasionally. See, e.g., State v. Bahre , Superior Court, judicial district of Hartford, Docket No. 102107, 2008 WL 1801531 (April 3, 2008) ("[f]urther, viewing the speech alone, it appears to me that the language **414 used, considering its tone and the circumstances surrounding its use, falls within the ... 'fighting words' [exception]"). Although the Supreme Court has not upheld a conviction under the fighting words exception since Chaplinsky , it continues to list fighting words among the exceptions to first amendment protection. See United States v. Alvarez , supra, 567 U.S. at 717, 132 S.Ct. 2537. Therefore, I assume that the fighting words exception remains valid for now, but I analyze the facts of the present case mindful that the exception is narrowly construed and poses a significant hurdle for the state to overcome.
I
With this background in mind, the first area where my reasoning diverges from that of the majority regards the applicability of the fighting words exception to statements that could prompt preemptive self-defense. The majority correctly concludes that such a theory is unpersuasive in the present case. However, I would go further, and conclude that preemptive self-defense is inconsistent with the fighting words exception in general, because it conflates the true threats and fighting words exceptions, and would expand the disfavored fighting words exception to encompass statements it is not intended to reach.
The state argues that "[t]he defendant's unconditional threat of violence would have brought the average addressee to the cusp of violent intervention to prevent the defendant from carrying out the threat, given the deadly consequences of guessing wrongly that the defendant did not mean what he said." In other words, the state contends that the fighting words exception applies to statements that provoke violence not due to anger, but, instead, out of a perceived need for preemptive self-defense.
After an exhaustive review of fighting words cases, I am aware of no controlling precedent that supports **415 such an argument.[2] Although fighting words jurisprudence *658 is "concerned with the likelihood of violent retaliation"; State v. Baccala , supra, 326 Conn. at 243, 163 A.3d 1 ; the underlying theory is that fighting words will provoke that violent retaliation by angering or insulting the addressee. See, e.g., Texas v. Johnson , supra, 491 U.S. at 409, 109 S.Ct. 2533 (rejecting application of fighting words exception to burning of American flag at protest because "[n]o reasonable onlooker would have regarded [statement as] ... a direct personal insult or an invitation to exchange fisticuffs " [emphasis added] ). **416 Indeed, it is telling that this court has concluded that the fighting words exception focuses on "whether there [is] a likelihood of violent retaliation ." (Emphasis added.) State v. Baccala , supra, 326 Conn. at 250, 163 A.3d 1. "Retaliation" has long denoted a motivation inconsistent with that of self-defense, and often embodies the idea of pay back or even revenge. See Webster's New World Dictionary (2d College Ed. 1972) (defining "retaliate" as "to ... pay back injury for injury" [emphasis added] ); see also Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining "retaliate" as "to return like for like; esp[ecially]: to get revenge"). Illustrative of this distinction, in another context the Connecticut criminal jury instructions clarify that "[t]he law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive." (Emphasis added.) Connecticut Criminal Jury Instructions 2.8-3, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited June 21, 2018). Thus, this court's use of the word "retaliation" in setting the boundaries of the fighting words exception indicates that the exception is justified by a concern that addressees will respond violently due to anger, and not because of a perceived need for preemptive self-defense.
This is not a matter of mere semantics; identifying the purpose behind the fighting words exception clarifies its doctrinal parameters and the types of speech that may fit within the exception. It is the true *659 threats exception that encompasses threatening statements that cause a listener to fear violence; State v. Krijger , supra, 313 Conn. at 449, 97 A.3d 946 ; not the fighting words exception. Thus, allowing the fighting words exception to encompass statements that might cause violent, preemptive self-defense would be inconsistent with the underlying theory of how fighting words work. Statements that are not threatening enough to be true threats or offensive enough to be fighting words would be exempt from **417 first amendment protection under a nebulous hybrid exception. This is a dangerous proposition given that the exceptions to first amendment protection are limited. See, e.g., Brown v. Entertainment Merchants Assn. , 564 U.S. 786, 791, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) ("[f]rom 1791 to the present ... the [f]irst [a]mendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations" [internal quotation marks omitted] ).
The present case involves a particularly attenuated chain between the defendant's statement and the application of the fighting words exception, and illustrates the problems inherent in conflating the fighting words and true threats exceptions. The defendant's statement arose out of an exchange with Kyle Lavin and David Lathlean, employees of Aquarion Water Company, who were on the defendant's property to perform fire hydrant maintenance.[3] The *660 defendant confronted Lavin **418 and Lathlean in an animated manner, and claimed that they had no right to be on his property. The defendant either said, "if you go into my shed, I'm going to go into my house, get my gun and [fucking] kill you," or, that if Lavin and Lathlean did not "get off" his property, **419 he would "get a gun or something like that ... to shoot" them. The defendant was shirtless, wearing a pair of shorts, and holding a can of worms.
The defendant's comments were conditional threats: either Lavin and Lathlean would leave his property and keep away from his shed, or the defendant would retrieve a gun from elsewhere on the property, come back, and "[fucking] kill" them. An analogous statement to the one made by the defendant, would be, "if you do not do what I demand, I will get you later." Violence in the face of such comments is not the response of a reasonable addressee.
As the majority correctly noted, such threats invite a range of responses in the reasonable person. A reasonable person might have retreated, as Lathlean was trained to do. Alternatively, a reasonable person might have called the police, as Lathlean did in the present case. Given these alternatives, a reasonable person would not have responded violently to the defendant's conditional threat by attacking a shirtless man armed with only a can of worms in order to escape speculative violence. It is unsurprising and telling that neither Lavin nor Lathlean considered responding with violence. Admittedly, it is tempting to ponder whether the fighting words exception would have applied had the threat been more immediate-for example, if the defendant had brandished a gun-but such hypotheticals tend to take the defendant's actions from the category of pure speech that must fit within a first amendment exception, to the realm of conduct in which the first amendment is not implicated. See State v. Indrisano , 228 Conn. 795, 812, 813, 640 A.2d 986 (1994) (holding that " 'fighting words' limitation ... must be applied when the conduct sought to be proscribed consists purely of speech," but not applying that limitation to defendant who was convicted for disorderly conduct on basis of physical conduct).
**420 *661 Having concluded that the fighting words doctrine does not encompass threats that might cause preemptive self-defense, I must consider whether the defendant's statement could otherwise rise to the level of fighting words. As I discuss in part II of this concurring opinion, they do not.
II
I agree with the majority that the defendant's statement does not amount to fighting words. The majority reaches this conclusion in part by relying on the job duties of the addressees in the present case, effectively extending one of the holdings of Baccala . In that respect, I think Baccala is distinguishable from the present case, and I therefore reach the same result through different analysis.
In holding that the statements "fat ugly bitch" and "cunt" were not fighting words when addressed to the assistant manager of a supermarket, this court relied heavily on the nature of the assistant manager's job duties. This court observed that she was "charged with handling customer service matters.... People in authoritative positions of management and control are expected to diffuse hostile situations, if not for the sake of the store's relationship with that particular customer, then for the sake of other customers milling about the store. Indeed ... the manager in charge of a large supermarket ... would be expected to model appropriate, responsive behavior, aimed at de-escalating the situation, for her subordinates, at least one of whom was observing the exchange." State v. Baccala , supra, 326 Conn. at 252-53, 163 A.3d 1. This court further observed that, "[s]ignificantly ... a store manager ... would have had a degree of control over the premises where the confrontation took place." Id., at 253, 163 A.3d 1.
These factors are not evident in the present case, where the addressees were water company employees **421 tasked with hydrant maintenance. First, unlike the assistant manager in Baccala , they had little control over the premises, as their work took them on to the property of another.[4] Second, as the majority observes, "the addressees in the present case were not in direct customer service roles ...." It is intuitive that employees whose primary role is customer service would interact differently with members of the public than those who interact with the public as an auxiliary part of their job. I agree with the majority that water company employees may occasionally encounter "confrontational property owners," as the present case illustrates, but I am skeptical that it would be a matter of routine as it was for the assistant manager in Baccala . It is not a question of whether the job duties of the addressee should be considered as a factor in assessing the application of the fighting words doctrine. Indeed, I have considered them in the present case, but find the job duties of Lavin and Lathlean distinguishable from those of the addressee in Baccala . Equating the job duties in Baccala to those of Lavin and Lathlean focuses too heavily on that factor and invites troubling line drawing issues. We would have to accept that other professionals who enter the property of another and occasionally interact with members of the public would be expected to weather extreme verbal abuse. This category could include professionals such as delivery personnel, utility *662 workers, and municipal employees.[5] **422 I would instead conclude that, in the present case, the defendant's statement did not constitute fighting words because of its content and context. Indeed, when viewed without the obfuscating haze of whether the statement was threatening, there is very little to support its inclusion in the fighting words exception. The defendant's threat would have to be so insulting that "a reasonable person in the position of the actual addressee would have been likely to respond with violence." State v. Baccala , supra, 326 Conn. at 245, 163 A.3d 1.
Although there are no per se fighting words, it is impossible to evaluate the applicability of the fighting words exception without considering the content of the defendant's statement. See id., at 251-53, 163 A.3d 1 (discussing offensiveness of statements in relation to circumstances in which they were made). The defendant's statement was not peppered with insults, epithets, slurs, or jeers; nor was it an "an invitation to exchange fisticuffs." Texas v. Johnson , supra, 491 U.S. at 409, 109 S.Ct. 2533. Although the defendant in the present case may have used the word "fucking," "[u]ttering ... [an] offensive word is not a crime unless it would tend to provoke a reasonable person in the addressee's position to immediately retaliate with violence under the circumstances." State v. Baccala , supra, 326 Conn. at 252, 163 A.3d 1. It is highly unlikely that the addition of that expletive in the defendant's statement would have provoked a violent response in a reasonable person in the position of the addressees. See Sandul v. Larion , 119 F.3d 1250, 1255-56 (6th Cir.) (holding that "the use of the 'f-word' in and of itself is not criminal conduct," and that, in light of Supreme Court precedent, its use does not amount to fighting words because "the mere words and gesture 'f-k you' are constitutionally protected speech"), cert. dismissed, 522 U.S. 979, 118 S.Ct. 439, 139 L.Ed.2d 377 (1997). Although I recognize that a threat can be inherently demeaning, and I can imagine hypothetical examples **423 of threats that are insulting in a manner that also makes them fighting words, the defendant's statement does not fall within that category.[6]
The circumstances surrounding the defendant's statement do not bring its content to the level of fighting words, as evidenced by the reactions of Lavin and Lathlean, who were not angered, let alone brought to the point of violent retaliation. See State v. Baccala , supra, 326 Conn. at 254, 163 A.3d 1 (noting that "reaction of the addressee is ... probative of the likelihood of violent reaction" [citation omitted] ). As the majority explains, "[a] subjective analysis of the addressees' actual reactions confirms our conclusion that it was unlikely that imminent violence would follow from the defendant's words." Lathlean testified that the defendant's comment "bounced right off" him, and Lavin testified that the statement caused him "alarm." These staid reactions seriously undermine the state's fighting words theory: the defendant's statement was not "akin to dropping a match into a pool of gasoline." (Internal quotation marks omitted.)
*663 State v. Baccala , supra, at 252, 163 A.3d 1.
Thus, I would conclude that the state has failed to establish that the content and context of the defendant's statement rose to the high level of offensiveness required for it to fall within the fighting words exception to first amendment protection. Although the defendant's statement was reprehensible, the fighting words exception is a poor fit for the present case. The state's strongest theory relies on an incorrect hybridization of fighting words and true threats, but, once separated, there is little if anything in the defendant's statement that would qualify it as fighting words under these circumstances. This is not to say that such statements **424 must be protected by the first amendment, however. The state could have pursued a true threats theory as I explain in part III of my concurring opinion.
III
Although the defendant's statement does not rise to the level of fighting words, it was a true threat. In the present case, the defendant told Lavin and Lathlean that he would shoot them if they did not comply with his demands. With regard to the constitutional parameters of the true threats exception, a reasonable person would foresee that threatening to shoot someone if he refused to follow demands would be interpreted as a serious expression of an intent to harm. See, e.g., New York ex rel. Spitzer v. Cain , 418 F.Supp.2d 457, 476 n.12 (S.D.N.Y. 2006) (suggesting that "[t]he statement 'If you don't give me your wallet, I will shoot you in the head' " would be a true threat, even if conditional). Furthermore, true threats may be conditional, like the threat made by the defendant. State v. Pelella , 327 Conn. 1, 16 n.15, 170 A.3d 647 (2017).
Thus, the defendant's statement fits within the true threats exception. See State v. Krijger , supra, 313 Conn. at 450, 97 A.3d 946 ("[w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard-whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault" [internal quotation marks omitted] ).
The remaining question is whether the state would have had to charge the defendant with threatening, instead of disorderly conduct, to pursue such a true threats theory.[7] I conclude that the state need not have **425 charged the defendant differently to maintain a true threats theory because the language of § 53a-182 (a) (1), under which the defendant was charged, encompasses speech that could constitute true threats. It provides that "[a] person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person ... [e]ngages in fighting or in violent, tumultuous or threatening behavior ...." (Emphasis added.) General Statutes § 53a-182 (a) (1). In construing that statutory provision, this court has held that the phrase "fighting ... violent, tumultuous or threatening behavior" includes conduct that is physical or that "portends imminent physical violence."[8] (Emphasis added; internal quotation *664 marks omitted.) State v. Indrisano , supra, 228 Conn. at 811, 640 A.2d 986. This statutory language is "identical" to that of the breach of the peace provision, General Statutes § 53a-181 (a) (1), which this court has held may encompass pure speech, providing that it fits within an exception to first amendment protection. State v. Szymkiewicz , 237 Conn. 613, 618-20, 678 A.2d 473 (1996). In so holding, this court focused specifically on whether § 53a-181 (a) (1) is consistent with the fighting words exception, but statutory provisions may simultaneously proscribe speech that falls within the true threats or fighting words exceptions. See State v. DeLoreto , 265 Conn. 145, 168-69, 827 A.2d 671 (2003) (concluding that § 53a-181 (a) (3) not only prohibits speech that constitutes true threats, but also fighting words). It is not the charge that determines which first amendment exception applies to speech, but, rather, the state's theory in responding to the defendant's specific first **426 amendment defense to that charge. Thus, I would conclude that § 53a-182 (a) (1) proscribes speech that falls within the true threats exception, and, if the state had pursued such a theory, the defendant would have been culpable under that statutory provision for making a true threat.
The state waived any claim that the defendant's speech constituted a true threat when it chose to argue that it constituted fighting words. As I have explained, the prosecutor, in closing arguments before the jury, conceded that "if the conduct consists purely of speech ... the speech must contain fighting words that would have a direct tendency to inflict injury or cause acts of violence." Similarly, at oral argument before this court, the state confirmed that its theory of the case was one of fighting words. By failing to articulate how the defendant's statement fit within the true threats exception, the state waived that theory of guilt. See State v. Sabato , 321 Conn. 729, 733, 138 A.3d 895 (2016) ("[w]e conclude that the state is precluded from arguing that the defendant's text message constituted a true threat because the state never pursued such a theory of guilt at trial").
IV
I do not condone the defendant's statement in the present case-the threat of gun violence is tasteless, shameful, and all too real. Indeed, the statement would have fit within the true threats exception to first amendment protection had the state made that argument. It did not. Furthermore, its attempt to alchemize the defendant's threatening statement into fighting words through a theory of preemptive self-defense is doctrinally and factually unpersuasive. Although I recognize that there may be instances where a true threat is insulting in a manner that also makes it fighting words, that is not the present case. The state simply failed to **427 raise the claim that the defendant's statement constituted a true threat, rather than fighting words, and, as such, was not protected speech.
For these reasons, I respectfully concur in the judgment.

Lavin admitted that, at one point, he exceeded the bounds of the easement, although, at the time, the defendant never precisely raised this issue to him.

Lathlean's exact testimony was that the defendant said he was going to " 'f'n kill you,' " but Lathlean clarified that he was censoring himself because of his presence in the courtroom.

Also, the defendant was originally charged with second degree threatening in violation of General Statutes (Rev. to 2011) § 53a-62, disorderly conduct, interfering with an officer in violation of General Statutes § 53a-167a, and first degree criminal mischief in violation of General Statutes § 53a-115. The state later filed a long form information eliminating the threatening and interfering with an officer charges and, instead, alleging fourth degree criminal mischief, disorderly conduct, and sixth degree larceny by theft of utility service in violation of General Statutes §§ 53a-119 (15) (B) and 53a-125b (a). The larceny charge alleged that the defendant had sought to obtain water service from the water company by tampering with equipment without the consent of the supplier in order to avoid payment, but the trial court dismissed that charge on statute of limitations grounds. Thus, the state filed a substitute long form information and proceeded to trial on only the charges of disorderly conduct and fourth degree criminal mischief.

This court in Baccala addressed the fighting words doctrine within the context of a conviction of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5), which prohibits using "abusive or obscene language ... or ... an obscene gesture" in a public place in order to cause inconvenience, annoyance or alarm. Although Baccala can be distinguished in this respect, our discussion of Connecticut's contemporary fighting words standard in that case nonetheless controls.

Totality of the circumstances tests can in fact be difficult to administer. In our view, however, the concurrence's observation that consideration of an addressee's employment position can lead to "troubling line drawing issues" might be an argument in favor of abolishing the fighting words doctrine, as some have advocated. See, e.g., W. Reilly, "Fighting the Fighting Words Standard: A Call for Its Destruction," 52 Rutgers L. Rev. 947, 947-49 (2000) ; Note, "The Demise of the Chaplinsky Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1140-46 (1993). We do not, however, believe this difficulty entitles us to ignore one among the totality of the attendant circumstances.

We note that the concurrence argues "that preemptive self-defense is inconsistent with the fighting words exception in general" and, therefore, would eliminate it entirely from a fighting words analysis. We decline to take a position on whether preemptive self-defense can or should ever be considered as part of the analysis in a fighting words case, as that question is not necessary to resolving this case.

We recognize, as we have in the past, that our constitutional inquiry does not seek to determine whether the words in question were offensive, reprehensible, or calculated to cause mental harm. State v. Baccala , supra, 326 Conn. at 251-52, 163 A.3d 1. Rather, our inquiry focuses squarely on whether the words would tend to provoke a reasonable person in the addressee's position to immediately retaliate with violence under the circumstances. Here, that high threshold is not met.

The concurrence goes so far as to decide that the utterance was in fact a true threat. We take no position on that issue, as that was not the theory the state pursued at trial or on appeal. See text accompanying footnote 3 of this opinion.

We do not read the dissent to rely on or defer to the jury's determination of whether any violent response by Lathlean and Lavin was likely or immediate. It is worth pointing out, however, that any inclination to defer to the jury in this case is potentially complicated by the trial court's instruction. "[I]t is ... constitutionally axiomatic that the jury be [properly] instructed on the essential elements of a crime charged." (Internal quotation marks omitted.) State v. Johnson , 316 Conn. 45, 58, 111 A.3d 436 (2015) ; see also State v. Baccala , supra, 326 Conn. at 309, 163 A.3d 1 (Eveleigh, J. , concurring in part and dissenting in part) (emphasizing that "[t]he federal constitution ... demands that a finding with respect to ... whether the speech would provoke an ordinary person ... to respond with immediate violence ... be made, in the first instance, by a properly instructed jury" [emphasis added] ). In Baccala , the concurring and dissenting opinion deemed "manifestly unjust" the trial court's charge to the jury on fighting words because, among other reasons, it "fail[ed] to convey that the jury must find that such violence be imminent." (Emphasis omitted.) State v. Baccala , supra, at 307-308, 163 A.3d 1 (Eveleigh, J. , concurring in part and dissenting in part). The justices who joined in the concurring and dissenting opinion in Baccala , therefore, would have reversed the defendant's conviction under the plain error doctrine, even though his claim regarding the jury instruction was unpreserved. Id., at 302-305, 163 A.3d 1 (Eveleigh, J. , concurring in part and dissenting in part); see State v. McClain , 324 Conn. 802, 815, 155 A.3d 209 (2017) (plain error review of jury instruction claim not precluded by waiver pursuant to State v. Kitchens , 299 Conn. 447, 482-83, 10 A.3d 942 [2011] ). The jury charge in this case arguably suffers from the same flaw. Nor did the state's closing argument communicate to the jury an accurate understanding of either the imminent violence element or, for that matter, against whom the violence might be directed. Like the majority in Baccala , we do not consider any instructional issue but, instead, have undertaken our own scrupulous examination of the record, leading us to conclude that the state's evidence did not make out a fighting words case. See State v. Baccala , supra, at 235 n.2, 163 A.3d 1.

Lavin testified that, in describing the defendant's statement in court, he censored himself out of respect for the court by substituting the term "f'n." I appreciate Lavin's respect for the tribunal, but recite the actual words the defendant used to convey the full gravity of his statements.

General Statutes § 53a-182 (a) provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior ...."

By way of background, I note that the "fighting words exception was first articulated in the seminal case of Chaplinsky v. New Hampshire , supra, 315 U.S. at 568, 62 S.Ct. 766. After noting that the right of free speech is not absolute, the United States Supreme Court broadly observed: 'There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words-those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' ...
"Unlike George Carlin's classic 1972 comedic monologue, 'Seven Words You Can Never Say on Television,' it is well settled that there are no per se fighting words.... Although certain language in Chaplinsky seemed to suggest that some words in and of themselves might be inherently likely to provoke the average person to violent retaliation, such as 'God damned racketeer' and 'damned Fascist' ... subsequent case law eschewed the broad implications of such a per se approach.... Rather, 'words may or may not be "fighting words," depending upon the circumstances of their utterance.' ...
"This context based view is a logical reflection of the way the meaning and impact of words change over time.... While calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when Chaplinsky was decided, those same words would be unlikely to even raise an eyebrow today. Since that time, public discourse has become more coarse. '[I]n this day and age, the notion that any set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic.' " (Citations omitted; emphasis omitted; footnote omitted.) State v. Baccala , supra, 326 Conn. at 237-39, 163 A.3d 1.

Like the concurrence, I recognize that there is somewhat of a square peg, round hole aspect to this case. It would seem that the defendant's statements would more typically be prosecuted under a "true threat" theory, insofar as true threats are similarly unprotected by the first amendment. See, e.g., State v. Pelella , 327 Conn. 1, 10, 170 A.3d 647 (2017) ; State v. Krijger , supra, 313 Conn. at 449, 97 A.3d 946 ; see also State v. Krijger , supra, at 452-53, 97 A.3d 946 (describing most true threat cases as encompassing statements conveying "explicit threat[s]" or expressing "the defendant's intention to personally undertake a course of action that would culminate in" injury to addressee). "True threats encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.... The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Internal quotation marks omitted.) State v. Krijger , supra, at 449, 97 A.3d 946. "In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard-whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.... [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Internal quotation marks omitted.) Id., at 450, 97 A.3d 946.
The fact that the prosecutor elected to proceed under a fighting words theory with respect to the defendant's statements in this case is not necessarily fatal to the state's case because the fighting words and true threat theories are not mutually exclusive; a statement could well satisfy either or both doctrines in a given case. See State v. Button , 622 N.W.2d 480, 486 (Iowa 2001) ("[b]ecause there is no legitimate purpose behind the true threats in these circumstances, the fact that the words may not fall under the category of fighting words is of no consequence"). Thus, I respectfully disagree with the concurrence's contention that the fact that a violent response by the addressee is motivated by a "perceived need for preemptive self-defense," rather than purely by anger at the remark, is sufficient to remove a statement from the ambit of fighting words as a matter of law insofar as "allowing the fighting words exception to encompass statements that might cause violent, preemptive self-defense would be inconsistent with the underlying theory of how fighting words work." In my view, the concurrence's attempt to compartmentalize fighting words and true threats into two neat doctrinal boxes overlooks the fact that a single statement-or different parts thereof-could, and in this matter, does, satisfy both doctrines.

I respectfully disagree with the concurrence's categorical rejection of what it considers the "preemptive self-defense" theory of liability under the fighting words doctrine. First, although the concurrence posits that there is "no controlling precedent that supports such an argument," it does not cite any cases standing for the proposition that a threatening statement lacking personal insult could not constitute fighting words as a matter of law. Second, I believe that the concurrence's focus on the term "violent retaliation" as conceptually inconsistent with the legal concept of self-defense, does not account for Chaplinsky 's definition of fighting words, addressed in Baccala , as those that are likely to "cause a breach of the peace by the addressee"; Chaplinsky v. New Hampshire , supra, 315 U.S. at 573, 62 S.Ct. 766 ; or "to provoke a violent response under the circumstances in which they were uttered ...." State v. Baccala , supra, 326 Conn. at 234, 163 A.3d 1. Specifically, I understand the courts to use the phrase "violent retaliation" as synonymous with "violent response." See id., at 250, 163 A.3d 1 ("Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation . This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." [Emphasis added.] ); compare id., at 240, 163 A.3d 1 ("proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation"), and id., at 243, 163 A.3d 1 ("because the fighting words exception is concerned with the likelihood of violent retaliation, it properly distinguishes between the average citizen and those addressees who are in a position that carries with it an expectation of exercising a greater degree of restraint"), with id., at 240-41, 163 A.3d 1 (noting that "the manner and circumstances in which the words were spoken bears on whether they were likely to incite a violent reaction" and "[t]he situation under which the words are uttered also impacts the likelihood of a violent response"), and id., at 245, 163 A.3d 1 ("[T]here are no per se fighting words; rather, courts must determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond with violence.").

I acknowledge Lathlean's testimony that "I don't really think I reacted to [the threat]. I just was like okay then go ahead. I didn't say that but I was just-it just bounced right off me, you know." Lathlean did, however, also state that it "sounds silly" that he was not frightened by the defendant's threat to get a gun and shoot. Giving weight to the jury's finding of the historical facts, and the fact that the water company employees nevertheless deemed it appropriate to summon the police because of the gun threat, I believe that an objective person in their situation would have deemed a response appropriate to the defendant's threat.

I recognize that "it is well settled that there are no per se fighting words." State v. Baccala , supra, 326 Conn. at 238, 163 A.3d 1. Accordingly, I do not suggest that any and all references to firearms render the statements at issue fighting words. Cf. State v. Kilburn , 151 Wash.2d 36, 39, 84 P.3d 1215 (2004) (juvenile's statement to classmate that he was " 'going to bring a gun to school tomorrow and shoot everyone and start with you' " was not true threat, despite fact that other students and parents were later concerned by it, when statement was made in joking manner while laughing, during conversation about military books, and there was no animosity between juvenile and listener).

I observe that the language this court used in analyzing § 53a-182 (a) (1) applies to the fighting words exception; see, e.g., State v. Szymkiewicz , 237 Conn. 613, 619, 678 A.2d 473 (1996) ("fighting words ... portend imminent physical violence"); but it illustrates this court's conclusion that the provision does not apply only to physical conduct, but also to speech that falls within an exception to first amendment protection.